861 P.2d 682

The STATE of Arizona, Appellee,

v.

Anthony LUZANILLA, Appellant.

Nos. 2 CA–CR 91–0053,
2 CA–CR 91–0853.

Court of Appeals of Arizona,
Division 2, Department B.

Feb. 26, 1993.

Review Granted Nov. 4, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie and Barbara A. Jarrett, Phoenix, for appellee.

Isabel Garcia, Pima County Legal Defender by Kathleen C. DuBois, Tucson, for appellant.

## OPINION

FERNANDEZ, Judge.

Appellant Anthony Luzanilla was convicted following two jury trials of two counts of first-degree murder, one count of trafficking in stolen property, two counts of theft, and one count of conspiracy to commit theft. The trial court sentenced appellant to two consecutive terms of life imprisonment for the murders, five years for trafficking in stolen property, five years and 1.5 years for the theft convictions, and an enhanced term of 11.25 years for conspiracy to commit theft. The court ordered the non-murder sentences to be served concurrently with the sentence for the first murder.

The charges against Luzanilla arose after he called authorities in San Diego and advised them that his best friend and subsequent codefendant, Lee Engebretson, had murdered a woman R. and her mother in Tucson. According to appellant's testimony, he and Engebretson had been driven to the victims' residence late the previous evening after spending most of the evening with friends shoplifting beer and cigarettes, drinking, and driving around town. Apparently, both appellant and Engebretson had dated R. and, according to appellant, when Engebretson knocked on the door at about 1:00 a.m., R. let them into the house and led them upstairs to her bedroom. Appellant testified that, unbeknownst to him, Engebretson had taken a gun and some ammunition from the truck of a friend with whom they had been driving around town and carried it with him into the victims' home.

Appellant stated that he sat at the end of the bed in R.'s room while Engebretson tried to persuade her to have group sex with them. When she refused and told Engebretson that she did not love him, Engebretson shot her in the head. Appellant testified he did not know what was happening until he heard the shot. Immediately thereafter, the mother came down the hallway toward the bedroom and Engebretson also shot her in the head. Appellant stated that he and Engebretson were in a panic when they left the house and they took R.'s car. After stopping at the homes of family and friends for money and clothing, appellant and Engebretson left town in R.'s car. Later that morning, they sold the gun at a pawn shop in Yuma. Appellant testified that he wanted to turn himself in because he had not done anything wrong, but he was afraid of Engebretson and Engebretson refused to surrender. After the two reached San Diego, appellant told Engebretson he wanted to turn himself in. When appellant went inside a gas station rest room, Engebretson left in the car. Appellant then called the authorities in San Diego.

The state tried the case on the theory that appellant was not merely present but had planned with Engebretson to sexually assault and/or steal from R. The state presented evidence that appellant knew Engebretson had the gun and that he and Engebretson had specifically asked their friend to leave them at R.'s so they could "do a threesome." The state also presented testimony from two of appellant's friends that appellant had suggested previously that they steal items from R. to sell in California and that he had even suggested to one of the friends that they kill her. In addition, another of appellant's friends testified that appellant came to his house after the murders asking for money and clothing and told the friend that he, not Engebretson, had pulled the trigger.

After the first trial, the jury found appellant guilty of trafficking in stolen property, theft by control of R.'s 1977 Camaro, and theft by control of the gun. The jury acquitted him of first-degree burglary, conspiracy to commit first-degree murder, conspiracy to commit first-degree burglary, and conspiracy to commit theft by control. The jury failed to reach a verdict on the first-degree murder charges. On retrial, the jury convicted appellant on both counts.

Appellant raises the following issues on appeal:

(1) whether the trial court erred in denying his motion to dismiss the trafficking in stolen property charge for lack of jurisdiction,

(2) whether his retrial for first-degree murder on a felony murder theory was barred by the double jeopardy provisions of the federal and state constitutions,

(3) whether his confrontation clause rights were violated by the reading of testimony from Engebretson's trial,

(4) whether the trial court abused its discretion in denying his motion for directed verdict on the count of premeditated first-degree murder of the mother, and

(5) whether the trial court abused its discretion in various evidentiary rulings made during the course of the trial. We find none of the issues raised merits reversal.

## JURISDICTION OF TRAFFICKING IN STOLEN PROPERTY COUNT

Prior to the first trial, appellant sought dismissal of the charge of trafficking in stolen property on the ground that Pima County did not have jurisdiction because the gun was sold in Yuma County. He also moved for a directed verdict on that ground. Appellant contends the trial court erred in denying his motions, arguing there was no evidence that conduct constituting an element of the offense occurred in Pima County. We disagree.

 Venue is proper in a county in which conduct constituting any element of the offense occurred. A.R.S. § 13–109(A). Proper venue is a jurisdictional requirement in criminal prosecutions, and the state must prove it by a preponderance of the evidence. *State v. Mohr*, 150 Ariz. 564, 724 P.2d 1233 (App.1986).

 In this case, analysis of the venue issue begins with the definition of "traffic" found in A.R.S. § 13–2301(B)(3):

"Traffic" means to sell, transfer, distribute, dispense or otherwise dispose of stolen property to another person, or to buy, receive, possess or obtain control of stolen property, with intent to sell, transfer, distribute, dispense or otherwise dispose of to another person.

Because possession of stolen property is an element of trafficking and the state presented evidence that appellant possessed the stolen gun in Pima County, venue was properly established. Contrary to appellant's argument, the state was not required to prove both that appellant possessed the stolen gun and that he formulated the intent to sell it while in Pima County. While evidence of possession without intent would not be sufficient to establish the completed crime of trafficking, evidence of the element of possession alone was sufficient to establish venue in Pima County. *State v. Mohr, supra* (evidence only of control of stolen property in Yavapai County sufficient to establish venue there).

## DOUBLE JEOPARDY EFFECT ON RETRIAL FOR FELONY MURDER

Appellant next argues that the double jeopardy provisions of both the state and federal constitutions barred the state from retrying him for the first-degree murders on a felony murder theory after the first jury acquitted him of first-degree burglary. Appellant reasons that, in acquitting him of first-degree burglary, the jury necessarily determined that he did not enter or remain in the victims' home with the intent to commit a felony; therefore, there could be no underlying felony to support a felony murder theory. Appellant concludes that, in arguing a felony murder theory, the state was allowed to prove conduct constituting an offense for which he previously had been acquitted, in violation of double jeopardy protections as set forth in *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), and *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

At the outset, we note that our discussion here pertains only to the felony murder argument regarding the killing of the mother. Pursuant to the court's interrogatory, the jurors indicated that none of them made a determination of guilt based upon both premeditated and felony murder but that ten of them reached their verdicts on a felony murder theory only. The jurors unanimously determined, however, that the first-degree murder of R. was both premeditated and felony murder. Despite appellant's argument to the contrary, we cannot say the evidence and argument in support of felony murder improperly tainted the jury's unanimous determination as to the premeditated murder of R.

In *Grady v. Corbin*, the Court stated: [T]he Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted.

495 U.S. at 521, 110 S.Ct. at 2093, 109 L.Ed.2d at 564 (footnote omitted). Appellant relies heavily on this holding in arguing that further prosecution on a felony murder theory was barred.

In response, the state first argues that retrial on one count of a multi-count indictment does not constitute a subsequent prosecution invoking the prohibition against double jeopardy. On this point, we agree with the Ninth Circuit that retrial following a hung jury is simply a continuation of a single prosecution and "does not raise the specter of successive prosecutions that *Grady* sought to eliminate...." *United States v. Seley*, 957 F.2d 717, 720 (9th Cir.1992). See also *State v. Nunez*, 167 Ariz. 272, 806 P.2d 861 (1991) (*Grady* inapplicable to single prosecution retried twice at defendant's request); *United States v. Bailin*, 977 F.2d 270 (7th Cir. 1992) (*Grady* inapplicable to retrial after mistrial). Accordingly, we find *Grady* inapplicable.

This court has previously determined, however, that the principle of collateral estoppel, an essential part of the double jeopardy clause in criminal prosecutions, is applicable to the retrial of charges contained in a multi-count indictment. *State v. de la Ossa*, 128 Ariz. 37, 623 P.2d 826 (App.1981); see also *United States v. Mespoulede*, 597 F.2d 329 (2d Cir.1979). The application of collateral estoppel in such cases bars the state from relitigating a question of fact that was determined in the defendant's favor by a partial verdict. *State v. de la Ossa.* As appellant is not arguing that the retrial should have been barred completely but simply that the issue of the existence of an underlying felony to support felony murder had already been litigated and resolved in his favor, we address the issue in the context of the doctrine of collateral estoppel.

In determining whether collateral estoppel bars the litigation of an issue on retrial of one count of a multi-count indictment, the court must examine the record of the prior proceeding to ascertain whether the issue was necessarily decided there. *State v. de la Ossa, supra;* see also *Dowling v. United States*, 493 U.S. 342, 110

S.Ct. 668, 107 L.Ed.2d 708 (1990); *Ashe v. Swenson, supra.* In this regard, the burden is on the defendant to establish that "the fact-finder acquitted him because it resolved in his favor the very issue that he seeks to foreclose from consideration in the second trial." *Mespoulede,* 597 F.2d at 333; *accord Dowling v. United States, supra; Ashe v. Swenson, supra.* In this case, then, appellant must prove that, when the jury acquitted him of first-degree burglary, it necessarily decided that he neither committed nor attempted to commit any felony while inside the victims' home that would support a finding of felony murder.

At the first trial, the jury was instructed on first-degree burglary as follows:

A person commits burglary by either entering or remaining unlawfully in a residential structure with the intent to commit a theft, sexual assault, robbery, or murder therein....

The crime of burglary in the first degree requires proof of two things:

1. The defendant committed burglary; and

2. At some time between the moment of entry through flight from the scene, the defendant or an accomplice was armed with a deadly weapon or a firearm.

The jury was instructed with regard to accomplice liability:

An accomplice is a person who with the intent to promote or facilitate the commission of an offense:

1. Solicits or commands another person to commit that offense; or

2. Aids, counsels, agrees to aid or attempts to aid another person in planning or committing the offense; o[r]

3. Provides means or opportunity to another person to commit the offense.

The evidence at trial was undisputed that the murders occurred inside the victims' home. It was also undisputed that, while they were inside the home, either appellant or Engebretson was armed with a gun. Thus, a rational jury could not have acquitted appellant of first-degree burglary for a failure of proof on either of those issues.

*See Ashe v. Swenson, supra* (rule of collateral estoppel is to be applied with realism and rationality). Appellant's argument, then, is that the jury must have determined that he did not commit or attempt to commit simple burglary, sexual assault, or robbery, the other underlying theories on which the jury was instructed. He concludes, therefore, that there was no underlying felony on which to base a felony murder argument.

The state misses appellant's point in responding simply that because appellant was acquitted only of first-degree burglary, the state was precluded only from arguing first-degree burglary as the underlying felony. Nonetheless, having examined the entire record of the proceedings, we cannot agree that by its verdict of acquittal on the first-degree burglary charge, the first jury necessarily resolved the factual issues as appellant suggests. In reaching our conclusion, we note that the jury failed to reach a verdict on the murder charges despite being instructed that burglary included remaining in a residence unlawfully with the intent to commit murder. Had the jury truly determined that appellant did not enter or remain in the victims' residence "with the intent to commit a theft, sexual assault, robbery or murder therein," it would have acquitted him on the murder charges. Rather, it appears that the jury either misconstrued its instructions or compromised on its verdict.

As to the instructions, the words "enter or remain unlawfully" were not defined. The jury may have erroneously believed from the words that the means used for gaining entry or for remaining inside the house were material to their deliberations. *See State v. Altamirano,* 166 Ariz. 432, 803 P.2d 425 (App.1990); *State v. Embree,* 130 Ariz. 64, 633 P.2d 1057 (App.1981). Under such a scenario, the jury could have determined that, because R. let appellant into the house and apparently did not ask him to leave, he neither entered nor remained unlawfully but did in fact intend to commit one of the enumerated felonies. Another likely explanation for the inconsis-

tent verdicts is that the jury simply compromised.

We recognize that "the possibility that the jury acquitted out of a desire to compromise or to show mercy, or from 'simple frustration after hours of tedious debate' is not a basis for refusing to apply collateral estoppel." *Mespoulede*, 597 F.2d at 333 n. 7 (citations omitted), quoting *United States v. Flowers*, 255 F.Supp. 485, 487 (E.D.N.C. 1966). However, in this case, we are not discarding other rational bases for the jury's verdict on the mere possibility that it was the result of compromise. Rather, as was the case in *Harary v. Blumenthal*, 555 F.2d 1113 (2d Cir.1977), we are faced with internally inconsistent verdicts from which we can only conclude that the jury acted irrationally. *See Dowling v. United States, supra; Ashe v. Swenson, supra.* Because we are not persuaded that the first jury resolved the very factual questions at issue in appellant's favor, we cannot say the trial court erred in allowing the state to argue its case on a felony murder theory.

## CONFRONTATION CLAUSE VIOLATION

As his next allegation of error, appellant argues that the reading into evidence of a witness's testimony from Engebretson's trial violated his confrontation clause rights under the sixth and fourteenth amendments of the United States Constitution. The witness, John Mojarro, was incarcerated at the time of appellant's trial and refused to testify, apparently in fear of being labeled a jailhouse "snitch." The state presented testimony from another jailhouse informant that appellant had threatened Mojarro's life if he testified against him. When he was questioned by the court, Mojarro specifically denied having been threatened by appellant.

The gist of Mojarro's earlier testimony was that, several days prior to the murders, while he and appellant were visiting at R.'s house, appellant approached him out of R.'s hearing and suggested that they steal her car and kill her. Mojarro testified that he thought appellant was joking and

that he did not take the suggestion seriously.

In considering the admissibility of the testimony, the trial court commented:

I guess what I'm thinking of is in terms of necessity. There is no other evidence that, that can be used to substitute for Mr. Moharo's [sic]; only testimony of people who were available at the time in question. Two of them are Defendants; that there is more than a sufficient indicia of reliability and trustworthiness, which seems to be required to [sic] the residual exception to both rules 802 and 804.

\* \* \* \* \* \*

I'm leaning towards admitting it, though, as I've indicated, in part, because I guess I have to take the position that Arizona would not have adopted the residual exception if it hadn't meant to consider or to have the trial court be able to consider the exceptional circumstances; the allowance of, of otherwise inadmissible hearsay when there's a reliability determination that I believe to be made and the necessity. I guess, I think that this may be such, such an instance.

■■■ Appellant makes a three-pronged attack on the trial court's ruling: (1) any consideration by the court of corroborating evidence was error, (2) there was insufficient evidence of direct threats against Mojarro for the court to find that appellant waived his confrontation rights, and (3) the statements were not made under circumstances of inherent trustworthiness. With respect to the first argument, appellant correctly notes that corroborating evidence is not to be considered in determining the reliability of testimony for confrontation clause purposes. *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Likewise, appellant is correct that a finding of waiver of confrontation clause rights by a defendant's procuring the unavailability of a witness should be made only by clear and convincing evidence. *United States v. Thevis*, 665 F.2d 616 (5th Cir.1982), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

He also correctly notes that, in making its ruling, the trial court heard argument from the state about corroborating evidence and referred to federal case law about waiver of confrontation clause rights. However, it is clear from the record that the court did not found its ruling on either of these two bases. Rather, as noted above, the court stressed its finding that the testimony bore sufficient indicia of trustworthiness and reliability to allow its admission.

■ While the confrontation clause guarantees criminal defendants the right to confront their accusers, U.S. Const. amend. VI, considerations of public policy override the clause if the declarant is unavailable and the statement bears adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). As the witness here refused to testify and the parties do not contest his unavailability, our sole consideration is the indicia of reliability.

■ Because the testimony at issue did not fall within a firmly rooted exception to the hearsay rule but was admitted only under its residual clause, Rule 804(b)(5), Ariz.R.Evid., 17A A.R.S., the requisite indicia of reliability must be established by a "showing of particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608 (footnote omitted). In *Idaho v. Wright*, 497 U.S. at 818, 110 S.Ct. at 3148, 111 L.Ed.2d at 655, the Supreme Court held that "particularized guarantees of trustworthiness" must be shown from the totality of the circumstances but that "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief."

Here, the testimony read into evidence was given under oath and the declarant was subject to cross-examination by Engebretson's counsel. Although appellant complains that the cross-examination did not explore the extent of Mojarro's intoxi-

cation or the effect of alcohol on his memory, Mojarro stated on direct examination that he was "pretty drunk at the time." As to his memory of the event, Mojarro initially stated that he did not remember any discussion with appellant about "doing anything [to R.]." When confronted with the fact of his earlier statement to police, however, Mojarro was able to relate specifics regarding the incident, including the configuration of the room and appellant's manner in making the suggestion.

■ Other evidence at trial established that Mojarro was good friends with both Engebretson and appellant and thus had no motive to fabricate the story. In addition, Mojarro's version of the incident remained consistent from the time of his statement to police to his testimony at Engebretson's trial.[1] The Supreme Court has suggested that both lack of a motive to fabricate and consistent repetition are factors the trial court can consider in determining reliability. *Idaho v. Wright, supra.* Under these circumstances, we cannot say the trial court erred in concluding that the testimony was given under particularized guarantees of trustworthiness. Moreover, as pointed out by the state, given the corroborating evidence presented at trial, any error would have been harmless beyond a reasonable doubt. *Id.* (the presence of corroborating evidence more appropriately indicates that any error in admitting hearsay testimony might be harmless).

## PREMEDITATED MURDER OF THE MOTHER

Appellant next argues that the trial court erred in denying his motion for a directed verdict on the charge of premeditated murder of the mother, contending that there was no evidence that either he or his alleged accomplice acted with the requisite intent or knowledge to support a premeditated first-degree murder charge. We disagree.

---

1. At the time of appellant's second trial, Mojarro also avowed to the court that his earlier testimo-
ny was truthful.

■ The jury heard evidence that, before the mother was murdered, appellant heard her come out of her bedroom and walk down the hallway screaming and asking what the noise was. While the time between the murders may have been as brief as a few seconds, those seconds provided sufficient time for appellant to reflect and to premeditate her murder even if he had not planned to kill her before he arrived at the scene. *See State v. Guerra,* 161 Ariz. 289, 778 P.2d 1185 (1989).

## EVIDENTIARY RULINGS

■ Finally, appellant challenges the trial court's rulings on three evidentiary issues. The admission of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *State v. Hallman,* 137 Ariz. 31, 668 P.2d 874 (1983). We find no abuse of discretion here.

### Styrofoam Wig Form

■ First, appellant challenges the admission of a styrofoam wig form with a pencil through it that was used by the medical examiner to demonstrate the trajectory of the bullet that killed R. Appellant complains that the exhibit was not relevant because the trajectory was not at issue and, in any event, the medical examiner could have illustrated his point adequately by positioning his finger at the proper point on his own head. In ruling on the admissibility of the wig form, the trial court stated that its introduction would be allowed to illustrate the medical examiner's testimony that the shot was fired from near-contact range and to demonstrate where the gunman would have been standing in relation to the victim. Demonstrative evidence is relevant if it illustrates or explains testimony and will be admitted if its probative value outweighs the danger of unfair prejudice. *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983).

■ After determining the exhibit was relevant, the court advised defense counsel that he disagreed with counsel's assessment that the exhibit was "grisly in the extreme." Even if we were permitted to

do so, we could not substitute our own judgment for that of the trial court's as the exhibit was not included in the record on appeal. In any event, considering the description of the exhibit in the abstract, we cannot conclude it presented a danger of unfair prejudice, particularly given the admission of crime scene and autopsy photographs that appellant has not challenged on appeal.

### Evidence of Appellant's Tattoos

■ Over the state's objection, appellant introduced the testimony of a clinical psychologist who had examined appellant prior to trial and determined that he did not suffer from any diagnosable mental disorder often found in individuals who have a propensity for violence. During his cross-examination of the witness, the prosecutor was allowed to introduce photographs of appellant's tattoos and to ask whether he had considered the tattoos in reaching his conclusions. One of the tattoos depicted the "grim reaper" and the other a horned skull. Appellant concedes that this court "may find that the appellant placed his character in issue" but complains nonetheless that the prosecutor's questioning and its implications went beyond the bounds of propriety. Specifically, appellant complains that the prosecutor's cross-examination suggested that the tattoos had a special symbolism linked to a "biker" lifestyle or to a violent character and argues that the state had no evidence to link him to any motorcycle gangs or cults that might identify with a "grim reaper" symbol.

We find no error either in the admission of the photographs or the prosecutor's line of questioning. The references to the tattoos were not an insinuation of a prior bad act but were offered as rebuttal to appellant's character evidence. *See State v. Stabler,* 162 Ariz. 370, 783 P.2d 816 (App. 1989). The psychologist testified that he had relied on his interview with appellant and the psychological tests he had administered in formulating his opinions. The trial court properly allowed the prosecutor to conduct a rigorous cross-examination to ascertain whether the witness, in reaching his conclusions, had considered the arguably violent and gruesome images appellant has

tattooed on his body. As we stated in *Stabler*, "[o]nce an expert offers his opinion, it is proper to inquire into the reasons for his opinion, including the facts upon which it is based, and to subject the expert to a most rigid cross-examination concerning his opinion and its sources." 162 Ariz. at 374, 783 P.2d at 820.

### Rebuttal Evidence of Engebretson's Character

 Finally, appellant argues that the trial court erred in precluding the admission of expert testimony about Lee Engebretson's propensities for impulsivity and secretiveness, contending that it was necessary to rebut the testimony that Engebretson was not known to be violent and that he and appellant were virtually inseparable. Appellant submits that the state sought to create the inference that "the co-defendants accepted and understood one another's thoughts, acting as one, but that any violent impulses originated with Mr. Luzanilla." In arguing the necessity of the expert testimony, defense counsel stated that the expert "would say Engebretson's personality type manifests itself by having a number of very shallow acquaintances with people and never showing his personality to others, therefore in acting in ways that surprise people who think they know him well." Appellant contends that the trial court's ruling denied him his right to present a defense of mere presence. Again, we disagree.

First, we are not persuaded that the evidence can be considered merely "symptoms of a personality disorder," as appellant suggests, as opposed to character evidence. In this regard, Rule 404(a), Ariz.R.Evid., 17A A.R.S., does not permit the introduction of character evidence of persons other than the accused, the victim, or a witness. That other evidence of Engebretson's character may have been admitted without objection does not alter the effect of the rule on the evidence in question.

 In any event, the trial court's ruling did nothing to prevent appellant from presenting his "mere presence" defense. Even if the state can be said to have opened the door to questions about Engebretson's character, the defense had ample opportunity to rebut the state's evidence through its own lay witnesses. In fact, the defense elicited testimony from several witnesses that they had known Engebretson for years and saw him often but did not feel they knew him well. These witnesses also testified that, while Engebretson was quiet and reserved when sober, he became loud and obnoxious and "wanted to fight" when drunk. Appellant himself testified that, although he and Engebretson spent a lot of time together, Engebretson remained distant and withdrawn and the two never shared any confidences. The proposed expert testimony was not necessary to complete the picture of appellant's relationship with Engebretson.

We have reviewed the record for fundamental error and have found none. The convictions and sentences imposed are affirmed.

DRUKE, P.J., concurs.

HATHAWAY, Judge, dissenting.

I respectfully dissent in part. I concur with the majority opinion with the exception of the issue of the retrial for felony murder as to the mother. I believe appellant is correct in his assertion that the double jeopardy provisions of the state and federal constitutions barred the state from retrying him on a felony murder theory.

I find the majority's reliance on *United States v. Seley*, 957 F.2d 717 (9th Cir.1992), to find *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), inapplicable and misplaced. *Seley* is distinguishable. There, the defendant was charged with possession of marijuana with intent to distribute, importation of marijuana and conspiracy to import marijuana. He was acquitted by a jury of the first two charges, but the jury hung on the conspiracy charge. The circuit court of appeals affirmed the district court's order that collateral estoppel barred the use of the evidence regarding the crimes of which the defendant was acquitted in a retrial on conspiracy, requiring that the charge be dismissed, but rejected the double jeopardy argument based on *Grady*. Conspiracy, unlike felony murder, does not rely on a predicate offense. An "essential element"

of felony murder is the commission of a felony. In contrast, while the facts regarding possession of marijuana for distribution and importation may have been the basis for the government's showing of an overt act in furtherance of the conspiracy in *Seley*, the offenses themselves are not "essential elements" of the crime of conspiracy.

Appellant was tried and found innocent of the crime of burglary in his first trial.

The state, in order to prove the felony murder of the mother, had to prove the underlying felony of burglary. The essential element of proof in the instant prosecution is the very offense for which appellant has already been prosecuted and found innocent. This clearly violates the holding in *Grady* that the state in a subsequent prosecution cannot, in that prosecution, establish an "essential element" of the offense charged, here felony murder, by proving conduct of an offense, here burglary, for which the accused has already been acquitted. In the instant case, appellant was acquitted of the felony charge of burglary. There is no predicate felony to support a felony murder charge.