932 P.2d 1328

STATE of Arizona, Appellee.

v.

David Scott DETRICH, Appellant.

No. CR–95–0085–AP.

Supreme Court of Arizona, En Banc.

Feb. 25, 1997.

**60**

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Phoenix, Eric J. Olsson, Assistant Attorney General, Tucson, for Appellee.

Law Offices of Barbara C. Sattler by Barbara C. Sattler and Carrie D. Stopek, Tucson, for Appellant.

## OPINION

MOELLER, Justice.

In his first trial, David Scott Detrich ("defendant") was convicted of first degree murder, kidnapping, and sexual abuse. This court affirmed the sexual abuse finding, reversed the murder and kidnapping convictions, and remanded for a new trial on the latter two charges. *State v. Detrich,* 178 Ariz. 380, 385, 873 P.2d 1302, 1307 (1994). On remand, a second jury found defendant guilty of first degree murder and kidnapping. The trial court sentenced defendant to twenty-one years for kidnapping and to death for first degree murder. Appeal to this court is automatic. Ariz. R.Crim. P. 26.15 and 31.2(b). We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3) and Ariz.Rev. Stat. Ann. ("A.R.S.") § 13–4031. We affirm defendant's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

Defendant and Alan Charlton[1] worked together at the Ocotillo Motors wrecking yard in Benson, Arizona. On November 4, 1989, a Saturday afternoon, defendant and Charlton left work and headed to a local bar. Charlton estimated that he and defendant each consumed between twelve and twenty-four cans of beer. Two hours after they started drinking, the men drove to Tucson.

Upon arriving in Tucson, defendant and Charlton visited several more bars and consumed more beer. At some point during the evening, defendant suggested that they "pick up" somebody. When the two men saw the victim, Elizabeth Souter, walking along the Palo Verde bridge, they stopped the car and Souter climbed in. Defendant asked her to help them obtain some cocaine. She agreed and directed the two men to a "roadhouse" where defendant and Souter purchased the cocaine.

The two men and Souter then drove to Souter's home, where defendant attempted to "cook a spoon," which entailed dissolving the cocaine in a spoon so that it could be injected. Defendant soon became angry because the syringe would not pick up the cocaine. Defendant began "screaming and hollering that the needle wasn't any good, or the cocaine wasn't any good." Defendant told Souter that she was going to pay for the bad drugs by having sex with him—"He told her they could go in the room or do it right there, or they would do it his way, and she did not want to do it his way." Three witnesses, Charlton, Tami Winsett, and Caprice Souter (the victim's daughter), confirmed that defendant was holding a knife against Souter's throat. Additionally, defendant threatened, "You must not believe me, I will kill you."

Defendant then told Souter, "Come on bitch, we are going for a ride." Souter, Charlton, and defendant climbed into Charlton's car. Charlton drove, defendant sat in the middle, and Souter sat up against the passenger door. Defendant ordered Charlton to drive out of town. Charlton testified that, while stopped at a red light, he looked at defendant and saw that defendant was "humping" Souter and asking her how she liked it. Moments later, Charlton again looked and saw that Souter's throat was slit. Charlton indicated that defendant then hit her and asked her who "she got the shit off

---

1. Co-defendant Charlton pled guilty to a single count of kidnapping and agreed to testify truthfully in exchange for a dismissal of the first degree murder charge. He was sentenced to ten and one-half years in prison.

of." Souter was unable to answer clearly; she just gurgled something. Defendant then hit her with his elbow and asked again who she got the drugs from. She gurgled again in answer. Defendant then asked, "Did you say Mike?" Souter gurgled a third and final time, and Charlton heard no more sounds from her. Although Charlton claims he never saw defendant actually stab Souter, Charlton was himself poked in the arm with the knife three or four times. The pathologist established that Souter was stabbed forty times.

At this point, defendant asked Charlton, "It's dead but it's warm. Do you want a shot at it?" Charlton declined. They drove to a remote area approximately fifteen minutes (seven to nine miles) from Souter's home. Charlton pulled the car over at defendant's request, and defendant dragged Souter's body into the desert.

After dumping the body, Charlton and defendant drove to their friend William Carbonell's house in Tucson. Carbonell testified that the two men showed up at his house at 4:00 a.m. The defendant was covered with blood, but Charlton had blood only on his right side. Approximately an hour later, defendant confessed to Carbonell that he had killed a girl by slitting her throat. Defendant explained that he grabbed the girl at her house and forced her into Charlton's car at knife point, where defendant killed her. Defendant further explained that he killed Souter because the drugs she had purchased were bad.

After several days, Carbonell called in an anonymous tip to the police, who were able to trace the call to Carbonell. After questioning Carbonell, the police went to Ocotillo Motors and arrested Charlton, who confessed his involvement in the crime. Defendant was arrested in New Mexico several days later in possession of a folding knife. Charlton identified the knife as his; however, he explained that it often fell out of his pants. Charlton confirmed that defendant possessed the knife the night of the murder. Charlton also noticed that defendant had the knife the morn-

ing after the murder and that it was covered with blood.

At his first trial, defendant was charged with first degree murder, kidnapping, and sexual assault.[2] The jury found defendant guilty of first degree murder, kidnapping, and sexual abuse, a lesser included offense of sexual assault. On appeal, we reversed defendant's convictions in part and remanded the case. We held that the trial court erred in failing to instruct on unlawful imprisonment, a lesser included offense of kidnapping, because the jurors rationally could have found that defendant lacked the requisite intent for the kidnapping charge, but was guilty of unlawful imprisonment. Because the jury could have based its first degree murder finding on a felony murder determination with kidnapping as the predicate felony, the murder conviction, as well as the kidnapping conviction, was reversed. The sexual abuse conviction was affirmed.

Defendant was retried and convicted of the murder and kidnapping charges. Defendant was sentenced to death for the murder and to twenty-one years in prison for the kidnapping.

## ISSUES PRESENTED

### I. Trial Issues

A. Whether the doctrine of collateral estoppel should have barred introduction of witness Charlton's testimony at defendant's second trial.

B. Whether a statement in the prosecution's closing argument constituted a violation of defendant's double jeopardy rights.

C. Whether the trial court erred by not inquiring during jury voir dire about the jurors' racial attitudes, prejudices, and biases.

D. Whether the trial court erred by not submitting defendant's questionnaire to the jury.

E. Whether the trial court erred by dismissing three jurors for cause when they

---

2. Before the first completed trial, there was a mistrial when a state witness testified that defendant had invoked his Fifth Amendment rights.

To prevent confusion, the phrase "first trial" identifies the first completed trial, not the mistrial.

stated that their opposition to the death penalty would affect their deliberation.

F. Whether the state improperly exercised its peremptory strikes to remove jurors with beliefs against the death penalty.

G. Whether the trial court erred by not striking for cause two jurors who had some ties to law enforcement.

## II. Sentencing Issues

A. Whether the murder was committed in an especially heinous, cruel, or depraved manner.

B. Whether the disparity in sentences between the defendant and the co-defendant was a mitigating factor.

C. Whether the trial court failed to properly balance the aggravating and mitigating factors.

## DISCUSSION

## I. TRIAL ISSUES

### A. Collateral Estoppel

■ Because defendant was implicitly acquitted of sexual assault in his first trial, defendant claims that the doctrine of collateral estoppel bars the introduction of any evidence of sexual intercourse in the second trial. *See United States v. DiFrancesco*, 449 U.S. 117, 136, 101 S.Ct. 426, 437, 66 L.Ed.2d 328 (1980). The state contends, however, that the evidence is admissible for the purpose of proving an element of kidnapping by showing intent to commit a sexual offense.

■ Collateral estoppel in criminal cases is an "integral part of the protection against double jeopardy guaranteed by the Fifth and Fourteenth Amendments." *Harris v. Washington*, 404 U.S. 55, 56, 92 S.Ct. 183, 184, 30 L.Ed.2d 212 (1971) (citing *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)). Collateral estoppel bars the state from relitigating a fact question previously determined in defendant's favor. *State v. Luzanilla*, 176 Ariz. 397, 401, 861 P.2d 682, 686 (App.1993) (holding that a fact determination necessarily decided in a partial verdict is barred by collateral estoppel in the retrial of the remaining charges), *affirmed in part,*

*vacated in part,* 179 Ariz. 391, 880 P.2d 611 (1994).

■ To invoke collateral estoppel on a specific issue, defendant has the burden of proving that the jury "acquitted him because it resolved in his favor the very issue that he seeks to foreclose from consideration in the second trial." *Luzanilla*, 176 Ariz. at 402, 861 P.2d at 687 (quoting *United States v. Mespoulede*, 597 F.2d 329, 333 (2d Cir.1979)). To determine the applicability of the doctrine, we must review the prior trial's record to determine whether the issue was "necessarily decided there." *Id.* at 401, 861 P.2d at 686. The United States Supreme Court promulgated, in *Ashe v. Swenson*, the standard for reviewing the prior trial record:

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine that record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings."

*Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194 (citations omitted). We examine defendant's first trial with this standard in mind.

In defendant's first trial, the state offered Charlton's testimony, recited above, concerning defendant's actions and words in the car on the fatal night. Specifically, the state introduced evidence that Charlton saw defendant "humping" Ms. Souter in the front seat and that defendant asked Charlton if he would like "a shot at it." The state also adduced evidence via the forensic pathologist that although there was no semen or sperm found within Ms. Souter's body, that fact did not rule out forced sexual intercourse.

At the close of the first trial, the trial judge instructed the jury on sexual assault and on sexual abuse, a lesser included offense of sexual assault. Sexual assault was defined as follows:

A person commits sexual assault by intentionally or knowingly engaging in sexual intercourse or oral sexual contact with any person without consent of such person. A.R.S. § 13–1406(A).

"Sexual intercourse" means penetration into the penis, vulva or anus by any part of the body or by any object or manual masturbatory contact with the penis or vulva. A.R.S. § 13–1401(3) (amended 1993).

Sexual abuse was defined as follows:

A person commits sexual abuse by intentionally or knowingly engaging in sexual contact with any person fifteen or more years of age without consent of that person. A.R.S. § 13–1404(A).

"Sexual contact" means any direct or indirect fondling or manipulating of any part of the genitals, anus or female breast. A.R.S. § 13–1401(2) (amended 1993).

The jury found defendant guilty of the lesser included offense of sexual abuse and thereby implicitly acquitted him of the greater offense of sexual assault. *See DiFrancesco*, 449 U.S. at 136, 101 S.Ct. at 437. In the second trial, therefore, no issue of sexual assault or sexual abuse remained. Nevertheless, the Charlton testimony was admissible because it was offered to prove an element of the kidnapping charge, namely, defendant's intent to commit a sexual offense.[3]

Defendant argues that the theory of collateral estoppel bars the introduction of this evidence at the second trial because the issue of whether defendant engaged in sexual intercourse has already been determined in his favor. We believe defendant misconstrues the issue. For collateral estoppel to apply, "the issue sought to be relitigated must be precisely the same as the issue in the previous litigation." *State v. Jimenez*, 130 Ariz. 138, 140, 634 P.2d 950, 952 (1981). In the second trial, Charlton's testimony was not offered to prove sexual intercourse, sexual assault, or sexual abuse. Rather, it was offered, together with defendant's statements

at Souter's home and testimony about Souter's half-nude body, to show defendant's *intent* to commit a sexual offense, an element of the offense of kidnapping. At the second trial, whether defendant actually had sexual intercourse with or sexually abused Ms. Souter was irrelevant; however, the state could, and did, offer the evidence to show that defendant *intended* to commit a sexual offense on the victim.

Defendant contends that the implied acquittal of sexual assault means that the jury at the first trial necessarily decided that Charlton's testimony regarding his observations of sexual activity in the car was not credible. We believe this analysis is incorrect. Other than Charlton's testimony of what happened in the car, there is no other evidence of contact of a sexual nature. Thus, to find sexual abuse, the jury must have determined that Charlton saw defendant engage in some form of sexual contact, but that Charlton's description of what he saw and heard fell short of describing completed sexual intercourse.

Defendant suggests, as an alternative explanation of the first jury's finding, that the testimony of Tami Winsett and Caprice Souter describe conduct of defendant upon which the jury could have relied in finding sexual abuse. Our careful review of the record in the first trial, however, reveals that their testimony does not support this suggestion.

We conclude that defendant has failed in his burden of proving that the Charlton testimony was barred by the doctrine of collateral estoppel. *Luzanilla*, 176 Ariz. at 402, 861 P.2d at 687.

## B. Double Jeopardy

■ Defendant claims that a statement in the prosecutor's closing rebuttal argument constituted, in effect, a second trial of defendant for sexual assault, in violation of his Fifth and Fourteenth Amendment right to be

---

**3.** A.R.S. § 13–1304(A) states, in relevant part:

A person commits kidnapping by knowingly restraining another person with the intent to:

. . . . .

3. Inflict death, physical injury or a sexual offense on the victim.

free from double ·jeopardy. He made no contemporaneous objection to the argument in the trial court. Defendant also failed to support his argument on appeal with any citations to authority. *See* Ariz. R.Crim. P. 31.13(c)(1)(iv); *State v. Carver,* 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989).

■ Even if the issue is properly here, however, it avails defendant nothing. The double jeopardy guarantee protects against, *inter alia,* a "second prosecution for the same offense after acquittal." *State v. Nunez,* 167 Ariz. 272, 275, 806 P.2d 861, 864 (1991). In the present case, the prosecution's statement did not, in any way, rise to the level of a second prosecution on the sexual assault charge. The state did not accuse defendant of sexual assault; neither did it implore the jury to find him guilty of sexual assault. The prosecutor merely stated that what the defense was implying was an incorrect interpretation of the facts. Thus, defendant's double jeopardy claim fails.[4]

## C. Questioning Jurors on Race Issues

■ Defendant argues on appeal that the trial court erred by failing to inquire during voir dire as to the jurors' racial attitudes, prejudices, or biases. The state argues that defendant waived this issue by failing to object at the time of the alleged error and also by failing to sufficiently argue this claim on appeal. We agree with the state.

■ Defendant argues that his proposed jury voir dire questionnaire, which was not utilized, sufficiently voiced his objection to the court's decision not to ask the jury questions about race. The purpose of a contemporaneous objection requirement is to allow for an immediate remedy for potentially improper or unconstitutional activities. *Harris,* 157 Ariz. at 36, 754 P.2d at 1140. This principle applies with full force to matters arising during the jury selection process. *Id.*

Implicit in this rule is the need to bring to the attention of the trial judge the specific activity (or lack of activity) complained of so that the judge may effect an immediate remedy.

When the judge denied the motion to provide the jury with defendant's written questionnaire, he indicated that he would incorporate some of the proposed questions into his selection procedures, and he would give the attorneys the opportunity to raise any other concerns or questions they might have during the questioning procedure. The judge completed his questioning without asking the jurors any questions about race issues. Defendant then passed the panel of jurors without ever objecting to the court's failure to question the jurors about race. *See State v. Walton,* 159 Ariz. 571, 581, 769 P.2d 1017, 1027 (1989) (holding that defendant "cannot object to the [jury] panel once he has approved it") (citations omitted), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

Only the last four questions[5] in defendant's three-page questionnaire addressed race. Because the race questions constituted such a de minimis portion of the questionnaire and because defendant failed to object contemporaneously to the absence of such questions, the questionnaire and the court's concomitant denial did not bring to the court's attention the defense's objection sufficiently to allow the court an opportunity for immediate remedy. Furthermore, defendant failed to support his argument on appeal with any citations to authority. Mere assertions of error are insufficient to persuade us. The issue is waived.

## D. Failure to Submit Questionnaire to Jurors

■ Defendant separately claims that the trial judge's failure to use his questionnaire precluded defendant from determining the jurors' prejudices and, consequently, de-

---

4. Because Charlton's testimony was not precluded by principles of collateral estoppel or double jeopardy, defendant's contention that the trial judge erroneously considered this evidence at sentencing is moot.

5. The four questions on race were as follows:
    1. What is your race?

2. Do you live in an integrated neighborhood?
3. Describe your relationship with any black friends, co-workers or acquaintances.
4. Do you believe blacks are more prone to commit crimes than white people? Explain.

nied defendant the right to intelligently exercise his peremptory challenges and challenges for cause. We believe this issue is also waived for failure to make a specific contemporaneous objection, but it is, in any event, meritless.

Defendant has not shown that the judge's failure to submit his questionnaire to the jury "resulted in a biased jury or rendered his trial fundamentally unfair." *See State v. Walden,* 183 Ariz. 595, 608, 905 P.2d 974, 987 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1444, 134 L.Ed.2d 564 (1996). Defendant offers no evidence of bias or prejudice of the jurors, but merely argues that we cannot "be sure that racial animus did not tip the scales." Defendant further contends that if race had been considered during voir dire, a juror with strong racial feelings *could have* raised his or her hand to indicate potential bias or prejudice. However, this speculation is insufficient to meet defendant's burden of proving that he was not provided a fair and impartial jury. *See id.; State v. Blackhoop,* 162 Ariz. 121, 122, 781 P.2d 599, 600 (1989); *State v. Arnett,* 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978).

■ Defendant cites to the recently amended Rule 18.5(d),[6] Ariz. R.Crim. P. Although the rule refers to jury questionnaires, it does not, in any way, require the submission of such questionnaires. The extent of voir dire examination is left to the sound discretion of the trial court. *State v. Murray,* 162 Ariz. 211, 214, 782 P.2d 329, 332 (App.1989); *Smith,* 114 Ariz. at 418, 561 P.2d at 742. After reviewing the transcript of the jury voir dire examination and the proposed questionnaire, we find that the trial judge did not abuse his discretion by not submitting the questionnaire to the jury.

### E.  Death Qualification of the Jury

■ Defendant contends that the trial judge erred in excusing three jurors because of their views on capital punishment. Although defendant orally objected to death qualification prior to voir dire, the objection was general in scope and did not constitute an effective objection to individual jurors. In *State v. Hyde,* 186 Ariz. 252, 921 P.2d 655 (1996) we held that objections to death qualification and objections to dismissal of individual jurors for death penalty views presented two separate issues. 186 Ariz. at 278, 921 P.2d at 681. *Hyde* held that "[d]efendant's objections to death qualification in general cannot extend to his argument on appeal that the trial court erroneously and prejudicially dismissed certain jurors for cause." *Id.* We further held that defendant's failure to object specifically to each juror's dismissal waived the claim, absent fundamental error. *Id.*

■ We therefore review the record to see whether fundamental error occurred. *State v. Gendron,* 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991). We have adopted the standard set forth in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), that a juror may be dismissed if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)); *Bolton,* 182 Ariz. at 301, 896 P.2d at 841; *State v. LaGrand,* 153 Ariz. 21, 33, 734 P.2d 563, 575 (1987); *State v. Martinez–Villareal,* 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985).

We have construed the *Wainwright* standard such that "[d]isqualification when a juror states his inability to be impartial is not only permissible but imperative." *Hyde,* 186 Ariz. at 277, 921 P.2d at 680 (quoting *State v. Wiley,* 144 Ariz. 525, 534, 698 P.2d 1244, 1253 (1985), *overruled on other grounds by State v. Superior Court,* 157 Ariz. 541, 544, 760 P.2d 541, 544 (1988)). The "bottom line is whether [a juror] can be fair and impartial, despite any feelings [he or she] might have about the death penalty." *Hyde,* 186 Ariz. at 278, 921 P.2d at 681.

All three of the excused jurors expressly confirmed that their views on the death penalty would interfere with their deliberations in the guilt phase of this case. Having clearly indicated their inability to be impartial, they were properly excused for cause. We

6.  Rule 18.5(d) states in relevant part: "Nothing in this Rule shall preclude the use of written questionnaires to be completed by the prospective jurors, in addition to oral examination."

find no error in that regard, let alone fundamental error.

### F. State's Use of Peremptory Challenges

■ Defendant next argues that the state improperly exercised its peremptory strikes to remove jurors with beliefs against the death penalty, claiming that this violated defendant's Sixth, Eighth, and Fourteenth Amendment rights to a fair and impartial jury. Defendant asks us to extend *Batson* to cover jurors excluded on the basis of their death penalty views. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* held that a prosecutor may not challenge potential jurors solely on account of their race. *Id.* at 88, 106 S.Ct. at 1719. We have previously addressed this issue and decided not to extend *Batson*'s purview to encompass death penalty views. *Bolton*, 182 Ariz. at 302, 896 P.2d at 842. We again decline to do so.

### G. Denial of Motions to Strike Jurors for Cause

■ Defendant claims that the trial judge erroneously declined to strike two jurors for cause.[7] We will not set aside a trial court's decision to deny a request to excuse a juror for cause absent a clear showing that the trial court abused its discretion. *State v. Bible*, 175 Ariz. 549, 574, 858 P.2d 1152, 1177 (1993); *State v. Hill*, 174 Ariz. 313, 319, 848 P.2d 1375, 1381 (1993). Defendant insists that the trial court's failure to dismiss for cause jurors Carpenter and Sigrest forced defendant to use peremptory strikes to remove the two jurors. Defendant was concerned that Carpenter's and Sigrest's close relationships with law enforcement would affect their impartiality.[8] Law enforcement ties, however, without some finding of par-

---

**7.** Defendant initially indicated that the trial judge improperly refused to strike four jurors for cause. However, two of the jurors were subsequently stricken by the state. As a result, defendant was unharmed by the court's failure to strike those two jurors for cause. Thus, we will address only the two not stricken by the state.

**8.** Mr. Carpenter's relationship with law enforcement consisted of working in industrial security, doing ride alongs with the Tucson Police and the Sheriff's department every couple of months, and

tiality, are insufficient to disqualify jurors. *State v. Pawley*, 123 Ariz. 387, 389, 599 P.2d 840, 842 (App.1979).

Five times during the jury voir dire Mr. Carpenter unequivocally confirmed that he would be impartial. First, Mr. Carpenter voluntarily approached the judge, explained his ties to law enforcement, and explicitly confirmed that those ties would "have no bearing on [his]decision." Second, in response to a later question as to whether his law enforcement ties would affect him as a juror, Mr. Carpenter replied in the negative. Third, although Mr. Carpenter said "I could be impartial, but I got to believe that he may be guilty for something because the detective is here and he is in court," the judge immediately again asked Mr. Carpenter if his law enforcement associations would affect his ability to be impartial. Again Mr. Carpenter said no. On the fourth occasion, the judge made the following statement:

> In a criminal trial the burden of proof is on the state to prove their case beyond a reasonable doubt before there could be a verdict of guilty on either of these counts. A Defendant in a criminal trial is presumed to be innocent. That presumption of innocence means that the Defense has no obligation to call witnesses to testify, they don't have to introduce any physical evidence in the course of the trial. The Defendant has the right to testify or refuse to testify as he and [defense counsel] choose.... I need to know if anyone would be unable to follow those principles of law if you are chosen to be on this jury? Mr. Carpenter, do you think that would be a problem for you?

To which Mr. Carpenter responded, "no sir." Fifth and last, the judge said:

> intending to test for the Sheriff's Department a month after the trial. Additionally, Mr. Carpenter's future father-in-law and five of his closest friends, including his best. man, worked for the Tucson Police Department or the Pima County Sheriff's Department.
>
> Ms. Sigrest's relationship with law enforcement consisted of having a grandson who was a deputy with the Pima County Sheriff's Department.

I was talking earlier about evaluating law enforcement officers who testify in the course of the trial and needing to keep an open mind about what they say. I need to make sure that everyone can evaluate them impartially and not either automatically believe them or disbelieve them just because they are in law enforcement.

... are you okay with that?

.    .    .    .    .

Mr. Carpenter, how about you?

To which Mr. Carpenter responded affirmatively. The final question was posed to Ms. Sigrest as well, to which she responded similarly.

Because defendant has not provided us a reasonable ground to believe that Mr. Carpenter or Ms. Sigrest could not render a fair and impartial verdict, the trial judge did not abuse his discretion in retaining both as jurors. *See* Ariz. R.Crim. P. 18.4(b); *State v. Lavers,* 168 Ariz. 376, 390, 814 P.2d 333, 347 (1991).

## II.  SENTENCING ISSUES

Defendant claims that the death penalty was unconstitutionally applied because the state failed to prove any aggravating factors beyond a reasonable doubt. In aggravation, the trial judge found that the murder was especially cruel, heinous and depraved. *See* A.R.S. § 13–703(F)(6). In mitigation, the judge found the following statutory and non-statutory circumstances:

(1) Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was significantly impaired but not so impaired as to constitute a defense to prosecution.

(2) Defendant comes from an abusive background, including both physical and mental abuse.

(3) Defendant feels some remorse for the killing.

(4) Defendant does not have prior violent convictions.

(5) Defendant has had a longstanding history of alcohol and drug abuse.

Although defendant acknowledges that courts do not merely count the number of aggravating and mitigating factors, he nonetheless argues for leniency because the quantity of mitigating factors outweighs the number of aggravating factors. Defendant also claims that the mitigating factors should be given more weight. The trial judge, however, found that the mitigating circumstances were not "sufficiently substantial to outweigh the aggravating circumstances of having committed this offense in an especially cruel, heinous or depraved manner as proved by the state and to call for leniency."

■ We must independently review the aggravating and mitigating circumstances to ensure that the trial court properly imposed the death penalty. *State v. Fulminante,* 161 Ariz. 237, 254, 778 P.2d 602, 619 (1988) (citations omitted), *aff'd,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

### A.  Aggravating Factors
#### 1.  Especially Cruel

■ Defendant asserts that there was insufficient evidence to find that the murder was especially cruel pursuant to A.R.S. § 13–703(F)(6). To find cruelty, the state must prove beyond a reasonable doubt that the victim consciously suffered physical pain or mental distress. *State v. Amaya–Ruiz,* 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990); *Jimenez,* 165 Ariz. at 453, 799 P.2d at 794. In determining whether a murder was especially cruel, we must view the entire murder scenario, not just the final act that killed the victim. *Lavers,* 168 Ariz. at 393, 814 P.2d at 350. Having done so, we have determined that this murder was, without a doubt, especially cruel.

We find overwhelming evidence that the victim was conscious throughout much of the crime. Witnesses testified that the victim looked terrified as defendant dragged her to the car. The pathologist testified that the victim suffered numerous cutting wounds over her hands, which are consistent with defensive-type injuries one would sustain while trying to fend off an attacker. After her throat was slit, she attempted to answer defendant's questions, but was able only to gurgle in response. The defense contends

that her gurgling may have been merely reflexive breathing. However, her gurgling was heard only after questions were posed to her.

We find that the victim suffered physical pain. She suffered forty cutting and stab wounds about her face, hands, chest, neck, abdomen, and thigh. This includes a deep cutting wound that stretched across the victim's neck from ear to ear, cutting through the voice box, the esophagus, and into the cerebral column. Furthermore, she suffered blunt force injuries, including bruises on her nose, jaw, and scalp, and scraping and tearing of the lining of her mouth. She must have suffered excruciating pain before she died.

We also find that the victim suffered mental distress. Mental distress includes uncertainty as to one's ultimate fate. *State v. Lopez*, 175 Ariz. 407, 411, 857 P.2d 1261, 1265 (1993). Witnesses testified that defendant held a knife to the victim's neck, told her that he was going to kill her, and dragged her to the car. During this time, the victim had "terror" and "fear" in her eyes. Anyone in the victim's situation would have been uncertain as to his or her ultimate fate. Thus, this murder was especially cruel.

### 2. Heinous and Depraved

■■■ Because the elements of A.R.S. § 13–703(F)(6) are stated in the disjunctive, our finding of cruelty is sufficient to satisfy the (F)(6) aggravating factor. Nonetheless, because defendant challenges each element and because the trial court found this to be the only aggravating factor, we address heinous and depraved as well. This court has defined "heinous" as "hatefully or shockingly evil" and "depraved" as "marked by debasement, corruption, perversion or deterioration." *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977). Heinousness and depravity focus upon the "defendant's state of mind at the time of the offense, as reflected by his words and acts." *Fulminante*, 161 Ariz. at 255, 778 P.2d at 620 (citing *State v. Summerlin*, 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983)).

This court has set forth specific factors which, when found, may be used to justify a trial court's finding that a murder was especially heinous or depraved. *State v. Gretzler*, 135 Ariz. 42, 51–52, 659 P.2d 1, 10–11 (1983). The factors are: (1) whether the killer relished the murder; (2) whether the killer inflicted gratuitous violence on the victim beyond that necessary to kill; (3) whether the killer needlessly mutilated the victim; (4) whether the crime was senseless; and (5) whether the victim was helpless. *Id.*; *Lopez*, 175 Ariz. at 412, 857 P.2d at 1266.

We find that the record supports the trial court's finding of heinous and depraved conduct. Defendant's statement to Charlton, "It's dead, but it's warm. Do you want a shot at it?" clearly shows that defendant relished the murder. The trial court found that this statement showed an abhorrent lack of regard for human life, and we agree. Furthermore, we find that defendant engaged in gratuitous violence beyond that necessary to cause death. *See State v. Jones*, 185 Ariz. 471, 488, 917 P.2d 200, 217 (1996). Of the forty cutting and stab wounds, only three were potentially fatal. The other thirty-seven sharp-force injuries and the countless bruises were unnecessary and excessive.

We also find that the victim was helpless. Defendant held a knife to the victim's throat and forced her into the car. She was unarmed and partially clothed, with no means of escape. In the car, defendant was on top of her, abusing and stabbing her. The victim was unable to resist defendant's attack.

■■■ Finally, the murder was senseless. A murder is senseless when it is unnecessary to achieve the killer's goal. *State v. Ross*, 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (1994). Defendant's apparent goal was to be paid back for the money he wasted on the bad drugs. Killing the victim was unnecessary to accomplish this goal and in fact, ensured that he would neither be paid back, nor find out the identity of the drug dealer. In total, the record overwhelmingly supports a finding of heinous and depraved conduct.

### B. Mitigating Factors

■■■ Defendant contends that the disparity between Charlton's ten-and-one-half-year jail sentence for kidnapping and defendant's

death penalty sentence for murder constitutes a mitigating factor. However, when the disparity between co-defendants' sentences results from an appropriate plea agreement with one of the defendants, the disparity is not considered a mitigating factor. *State v. Stokley*, 182 Ariz. 505, 523, 898 P.2d 454, 472 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 787, 133 L.Ed.2d 737 (1996). Mere disparity between two sentences is not significant, "but, rather, unexplained disparity." *State v. Schurz*, 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993). Moreover, if the murder is found to be especially cruel, heinous, or depraved, "even unexplained disparity has little significance." *Id.* In the present case, Charlton received a lesser sentence in part because he entered into a plea agreement by which he pled guilty to kidnapping and was required to give truthful testimony against defendant. More significantly, Charlton was much less culpable than defendant as shown by the facts cited above. As a result, the disparity in sentencing is explainable and understandable. The trial judge properly disregarded the disparate sentences as a mitigating factor.

### C. Balancing the Aggravating/Mitigating Factors

■ Defendant argues that the trial judge's finding of only one aggravating factor and significant mitigating evidence raises a question as to whether this crime warrants the death penalty. *See State v. Rockwell*, 161 Ariz. 5, 16, 775 P.2d 1069, 1080 (1989). In the instant case, defendant's mitigating evidence is less significant than it initially might seem. Although defendant expressed some remorse for the victim's death, he claims that he was not responsible. Although the trial judge found that defendant's alcoholic state significantly impaired him, the judge noted that defendant was cognizant of his surroundings and was capable of carrying on conversations with Charlton and the victim. Furthermore, the evidence supporting the aggravating factor was substantial and horrific. We have reviewed all of the trial court's findings on mitigation and, when balanced against the circumstances constituting the sole aggravating factor, the mitigating evidence is insufficient to warrant leniency.

### DISPOSITION

We have reviewed and considered all of defendant's claims of error. In light of defendant's death sentence, we have independently reviewed and reweighed the aggravating and mitigating circumstances. Having done so, we concur with the trial court's findings and affirm defendant's convictions and sentences.

ZLAKET, C.J., JONES, V.C.J., and FELDMAN and MARTONE, JJ., concur.