GRABER, Circuit Judge,
with whom KOZINSKI, Chief Judge, and GOULD, BEA, and MURGUIA, Circuit Judges, join, dissenting:
I respectfully dissent.
This case presents one question arising under 28 U.S.C. § 2254(d)(1): whether the Arizona courts unreasonably denied Petitioner’s claim that he received ineffective assistance of counsel (“IAC”) at sentencing. Petitioner’s motion presents us with a different legal question: whether the Supreme Court’s recent decision in Martinez v. Ryan,—U.S.-, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), allows Petitioner to overcome his procedural default *1263 as to certain claims of IAC concerning the guilt phase of his trial. The majority decides neither, leaving the sentencing issue for another day and punting the Martinez question to the district court. In my view, a remand without a ruling fosters undue delay. Some of Petitioner’s IAC claims were waived; as to others, which the state court decided on the merits, Martinez is irrelevant; and the remainder do not meet either the “cause” or the “prejudice” prong of Martinez. I would, therefore, deny the motion to remand and decide the sentencing IAC claim now.
A. Petitioner’s Martinez Motion
1. The Evidence at Trial
The majority provides a thorough recitation of the evidence at trial that favored one side: Petitioner. But it glosses over, dismisses, or ignores substantial evidence on the other side — evidence that the jury and the sentencing court found sufficient to establish beyond a reasonable doubt both Petitioner’s guilt and his eligibility for a capital sentence.
That evidence includes substantial testimonial and forensic evidence that Petitioner was the killer. Witnesses testified that Petitioner held a knife to the victim’s throat, that he demanded that she have sex with him, that he threatened to kill her, that he forced her into the passenger side of a car, that he entered the car on the passenger side, and that Charlton drove the car away. Charlton testified that Petitioner forced the victim into the car at knife-point, that Charlton drove the car while Petitioner and the victim were in the passenger seat and that, at some point, he saw Petitioner “humping” her. He also testified that, when he looked over later, the victim’s throat had been slit; in response to several questions, she made only a “gurgling” noise. Charlton further testified that Petitioner asked if Charlton wanted “a shot at it” after the victim was dead and that Petitioner deposited the body in the desert.
In addition to those witnesses, a pathologist testified that the victim received at least 40 cutting and stabbing wounds, as well as numerous blunt-force injuries, which were consistent with Charlton’s testimony. Another expert testified that Charlton’s fingerprints were found on the interior of the driver’s side window of his car, whereas Petitioner’s prints were found on the passenger side of the car. And William Carbonell, a co-worker and acquaintance of Petitioner and Charlton, testified that the two men arrived at his house covered in blood, that Charlton had blood only on his right side but Petitioner had blood all over himself, that Petitioner confessed to killing a woman in a manner that was consistent with Charlton’s testimony, and that Charlton related to him an account of what had happened that was similar to Charlton’s testimony at trial. The majority avoids the significance of this testimonial evidence, the forensic evidence that corroborated it and, most importantly, the state court’s determination that the evidence proved, beyond a reasonable doubt, that Petitioner was the killer.
The trial evidence and the facts of this case were fairly summarized by the Arizona Supreme Court, as follows:
[Petitioner] and Alan Charlton worked together at the Oeotillo Motors wrecking yard in Benson, Arizona. On November 4, 1989, a Saturday afternoon, [Petitioner] and Charlton left work and headed to a local bar. Charlton estimated that he and [Petitioner] each consumed between twelve and twenty-four cans of beer. Two hours after they started drinking, the men drove to Tucson.
Upon arriving in Tucson, [Petitioner] and Charlton visited several more bars *1264 and consumed more beer. At some point during the evening, [Petitioner] suggested that they “pick up” somebody. When the two men saw the victim, Elizabeth Souter, walking along the Palo Verde bridge, they stopped the car and Souter climbed in. [Petitioner] asked her to help them obtain some cocaine. She agreed and directed the two men to a “roadhouse” where [Petitioner] and Souter purchased the cocaine.
The two men and Souter then drove to Souter’s home, where [Petitioner] attempted to “cook a spoon,” which entailed dissolving the cocaine in a spoon so that it could be injected. [Petitioner] soon became angry because the syringe would not pick up the cocaine. [Petitioner] began “screaming and hollering that the needle wasn’t any good, or the cocaine wasn’t any good.” [Petitioner] told Souter that she was going to pay for the bad drugs by having sex with him— “He told her they could go in the room or do it right there, or they would do it his way, and she did not want to do it his way.” Three witnesses, Charlton, Tami Winsett, and Caprice Souter (the victim’s daughter), confirmed that [Petitioner] was holding a knife against Souter’s throat. Additionally, [Petitioner] threatened, “You must not believe me, I will kill you.”
[Petitioner] then told Souter, “Come on bitch, we are going for a ride.” Souter, Charlton, and [Petitioner] climbed into Charlton’s car. Charlton drove, [Petitioner] sat in the middle, and Souter sat up against the passenger door. [Petitioner] ordered Charlton to drive out of town. Charlton testified that, while stopped at a red light, he looked at [Petitioner] and saw that [Petitioner] was “humping” Souter and asking her how she liked it. Moments later, Charl-ton again looked and saw that Souter’s throat was slit. Charlton indicated that
[Petitioner] then hit her and asked her who “she got the shit off of.” Souter was unable to answer clearly; she just gurgled something. [Petitioner] then hit her with his elbow and asked again who she got the drugs from. She gurgled again in answer. [Petitioner] then asked, “Did you say Mike?” Souter gurgled a third and final time, and Charlton heard no more sounds from her. Although Charlton claims he never saw [Petitioner] actually stab Souter, Charl-ton was himself poked in the arm with the knife three or four times. The pathologist established that Souter was stabbed forty times.
At this point, [Petitioner] asked Charlton, “It’s dead but it’s warm. Do you want a shot at it?” Charlton declined. They drove to a remote area approximately fifteen minutes (seven to nine miles) from Souter’s home. Charl-ton pulled the ear over at [Petitioner’s] request, and [Petitioner] dragged Souter’s body into the desert.
After dumping the body, Charlton and [Petitioner] drove to their friend William Carbonell’s house in Tucson. Carbonell testified that the two men showed up at his house at 4:00 a.m. [Petitioner] was covered with blood, but Charlton had blood only on his right side. Approximately an hour later, [Petitioner] confessed to Carbonell that he had killed a girl by slitting her throat. [Petitioner] explained that he grabbed the girl at her house and forced her into Charlton’s car at knife point, where [Petitioner] killed her. [Petitioner] further explained that he killed Souter because the drugs she had purchased were bad.
After several days, Carbonell called in an anonymous tip to the police, who were able to trace the call to Carbonell. After questioning Carbonell, the police went to Ocotillo Motors and arrested *1265 Charlton, who confessed his involvement in the crime. [Petitioner] was arrested in New Mexico several days later in possession of a folding knife. Charlton identified the knife as his; however, he explained that it often fell out of his pants. Charlton confirmed that [Petitioner] possessed the knife the night of the murder. Charlton also noticed that [Petitioner] had the knife the morning after the murder and that it was covered with blood.
[Co-defendant Charlton pleaded guilty to a single count of kidnapping and testified against Petitioner. He was sentenced to ten and one-half years in prison.]
State v. Detrich (Detrich II), 188 Ariz.57, 932 P.2d 1328, 1331-32 (1997) (footnote omitted).[1]
2. Application of Martinez
Under Martinez, a court may excuse the procedural default of an IAC claim in cases like this one if the petitioner establishes both (1) cause, by showing either that no counsel was appointed in the initial-review collateral proceeding or that the appointed post-conviction counsel was ineffective under Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and (2) prejudice, by showing that the underlying claim of trial counsel’s ineffectiveness is “substantial,” meaning that it has “some merit.” Martinez, 132 S.Ct. at 1318-19; see also Trevino v. Thaler,—U.S.-, 133 S.Ct. 1911, 1918, 185 L.Ed.2d 1044 (2013) (noting that Martinez may apply to a procedurally defaulted trial-phase IAC claim if “the claim ... was a ‘substantial’ claim [and] the ‘cause’ consisted of there being ‘no counsel’ or only ‘ineffective’ counsel during the state collateral review proceeding” (quoting Martinez, 132 S.Ct. at 1320)).[2] A meritorious Strickland claim requires a showing of both deficient performance and prejudice. 466 U.S. at 687, 104 S.Ct. 2052.[3] The majority and I agree on that much.
*1266 I strongly disagree, though, with the majority’s assertion that any “standard practice” warrants a remand to the district court for application of those purely legal principles to the record that is already before us. Maj. op. at 1248. We frequently decide legal issues that an intervening decision of the Supreme Court has cast in a different light, at least when “all of the facts relevant to our analysis are fully set forth in the record.” Phelps v. Alameida, 569 F.3d 1120, 1135 (9th Cir.2009). Indeed, we have done so when applying Martinez before. See Miles v. Ryan, 713 F.3d 477, 494-95 (9th Cir.2013) (applying Martinez, which was decided during the appeal, to a capital habeas petitioner’s claims).”[4] Here, the issue — -whether Petitioner’s claims are procedurally defaulted — is a legal one, see Cooper v. Neven, 641 F.3d 322, 326 (9th Cir.) (noting de novo review of procedural default determination), cert. denied,— U.S.-, 132 S.Ct. 558, 181 L.Ed.2d 398 (2011), albeit one that requires our reconsideration after Martinez. There is no reason not to decide the issue unless further evidentiary development is necessary. It is not.
Judicial economy and the Antiterrorism and Effective Death Penalty Act of 1996’s (“AEDPA’s”) policy of reducing delay in habeas proceedings also favor reaching a decision now. See Woodford v. Garceau, 538 U.S. 202, 206, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003) (“Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases.” (citing Williams v. Taylor, 529 U.S. 362, 386, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000))). We have many capital cases currently on appeal in which the petitioners have filed motions under Martinez. In the interest of avoiding needless delay, we should first assess whether Martinez applies, before mechanically remanding such cases.
Furthermore, in this case, the majority’s over-broad remand will extend that delay beyond what is either necessary or equitable. The majority sees potential merit in four claims but, as I will discuss below, two of those claims were not explicitly raised in Petitioner’s motion. On remand, is the district court to consider those waived claims, and others like them? And what about the claims that are properly before us but that even the majority seems not to view as potentially meritorious?
3. Petitioner’s Martinez Claims
Petitioner’s motion for remand raises ten claims of guilt-phase IAC: (1) failure to interview and call some witnesses; (2) failure to investigate co-defendant Alan *1267 Charlton adequately; (3) failure to interview Phillip Shell, to call him to testify at trial, or to have his testimony from Petitioner’s first trial read to the jury; (4) failure to participate actively in voir dire; (5) failure to have the peremptory strike process recorded; (6) failure to rehabilitate jurors regarding issues about the death penalty; (7) failure to conduct independent forensic testing or consult an independent pathologist; (8) failure to present Petitioner’s misidentification defense effectively; (9) failure to object to prosecu-torial vouching; and (10) cumulative error.[5]
The majority remands the case with respect to all claims that Petitioner has raised. It does so on account of four claims that it views as potentially meritorious. There are three errors in the majority’s approach. First, two of the claims that it cites were not specifically raised in Petitioner’s motion and are, therefore, not properly before us. Second, one of those claims, as well as three other claims that the majority does not discuss, were decided on the merits in state court and therefore are not subject to the Martinez exception to procedural default. Finally, even assuming that all the claims that Petitioner raises could be considered under Martinez, none of them is “substantial,” and a remand is therefore a futile gesture. I will explain each of those problems in more detail.
a. Some of Petitioner’s Claims Are Waived
Petitioner’s IAC claims arising from trial counsel’s alleged failure to interview and call as witnesses Darci and Donald Bell, and counsel’s alleged failure to interview and cross-examine William Carbonell with a prior inconsistent statement, were waived. Issues that are not “specifically and distinctly” argued in an opening brief are waived. United States v. Kama, 394 F.3d 1236, 1238 (9th Cir.2005). Neither Carbonell nor the Bells are mentioned in Petitioner’s brief in support of his motion.[6] The majority emphasizes that Petitioner has moved for us to remand his claims to the district court, not to determine the substantiality of those claims ourselves. But, with respect to his lawyer’s alleged failure to investigate the Bells and to interview and to cross-examine Carbonell, Petitioner has not properly asked even for a remand.
I would not reach, even in part, issues that Petitioner simply has not raised properly for our consideration. The majority appears to view the Bell and Carbonell claims as having been raised by Petitioner’s footnoted “incorporation by reference” of filings in the district court. As I have explained, that passing reference to 59 pages of argument relating to a scatter-shot of dozens of claims is not a “specific[ ] and distinct[ ]” argument in support of any specific claim. Kama, 394 F.3d at 1238. *1268 The majority excuses Petitioner’s waiver because it views the motion’s vague “summary” of Petitioner’s claims as sufficient for these purposes. I do not agree. The substantial delay and expense of a new round of litigation on remand warrant a specific and substantial showing that at least one Martinez claim requires further fact-finding.
b. Some of Petitioner’s Claims Were Decided on the Merits
Second, Petitioner seeks to revive claims that he raised in his first petition for post-conviction relief (“PCR”) and that the state courts decided on the merits. Of Petitioner’s Martinez claims that are not waived, four appeared in his first PCR petition. Those are counsel’s alleged failure to (1) obtain independent forensic testing or an independent pathologist, (2) bring witness Shell to court to testify, (3) rehabilitate jurors regarding death-penalty qualification, and (4) object to alleged pros-ecutorial vouching. Those claims were all rejected on the merits in the Pima County Superior Court’s decision on the first PCR petition. The holding of Martinez — that procedural default of a guilt-phase IAC claim can be excused if it was due to PCR counsel’s ineffectiveness — has no application when the claim was not defaulted. Rather, claims that the state courts decided on the merits must be analyzed under the deferential framework of 28 U.S.C. § 2254(d) and the evidentiary bar set forth in Cullen v. Pinholster,—U.S.-, 131 S.Ct. 1388, 1400, 179 L.Ed.2d 557 (2011).
c. None of Petitioner’s Claims Is Substantial
Even if those barriers to considering some claims are ignored, none of Petitioner’s underlying guilt-phase IAC claims is substantial, so Martinez cannot excuse their default. Few, if any, of the alleged trial-counsel errors fell “below an objective standard of reasonableness,” the standard for deficient performance. Strickland. 466 U.S. at 687-88, 104 S.Ct. 2052. And none of them establishes prejudice, which requires that “[t]he defendant ... show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052; see also Lopez v. Ryan, 678 F.3d 1131, 1139 (9th Cir.) (concluding that a claim was not substantial under Martinez where the petitioner could not show a reasonable probability of prejudice under Strickland), cert. denied,—U.S.-, 133 S.Ct. 55, 183 L.Ed.2d 698 (2012).
Before reviewing the substantiality of each individual claim, I note that all of Petitioner’s claims must be viewed in light of three over-arching points. First, I have reviewed the record and found no indication that Petitioner’s PCR counsel was ineffective. Counsel conducted some independent investigation (obtaining, for example, a detailed psychological report that is central to the sentencing issue in this appeal) and requested funds for further investigation. The PCR petition raised many of the claims that Petitioner continues to assert as meritorious today. Thus, I doubt that Petitioner can satisfy the first prong of the Martinez analysis.
Next, with respect to the second prong, the record shows that Petitioner’s trial counsel did a good job of trying this case but that the evidence at trial prevented him from obtaining a different result. For example, counsel developed and presented to the jury a coherent and plausible theory of defense, actively cross-examined the prosecution’s witnesses, and gave a forceful opening statement and closing argument. Indeed, Petitioner’s counsel effectively presented to the judge and jury much of the evidence that the majority *1269 cites in support of the view that Petitioner’s co-defendant may have been the killer. The majority’s fresh assessment of that evidence accordingly says little about whether Petitioner’s trial counsel was deficient. Which brings me to my third point.
The evidence of Petitioner’s guilt as the killer — detailed above — was powerful. The jury’s verdict and the sentencing court’s determinations appear to reflect their reasonable assessments of the evidence at trial, not any ineffectiveness on the part of counsel.[7] Petitioner accordingly faces a difficult task in showing that his underlying IAC claims have merit under the prejudice prong of the Strickland analysis.
Claim 1: Failure to Investigate Witnesses Adequately
Petitioner first claims that his counsel’s preparation for trial was inadequate because counsel “failed to locate or interview critical eyewitnesses.” The remand motion describes which witnesses Petitioner’s counsel should have called as “eyewitnesses at the crime scene,” “witnesses who knew the victim and had observed her the evening of the crime,” and “the investigating police officers.”
With respect to the victim’s daughters (who were in the victim’s home when Petitioner threatened and sexually abused her), Winsett (who was also there), Carbo-nell (the person who saw Petitioner eov-ered in blood and to whom Petitioner confessed), and three police detectives, little or no prejudice resulted from counsel’s failure to interview them because those witnesses testified at trial and were effectively cross-examined by defense counsel.[8] Petitioner fails to explain how further investigation of those witnesses would have improved his defense or to identify other specific witnesses that counsel should have interviewed. Although Petitioner’s amended habeas petition named 21 other potential witnesses, any claim arising from those witnesses is, as I have explained, waived.
Because the majority gives special consideration to two of the waived claims, I will address why those claims, even if they had been raised properly, would not warrant a remand under Martinez. The first such claim is the alleged failure to interview and call as witnesses Darci and Donald Bell. With respect to those witnesses, Petitioner does not establish prejudice. Darci Bell is Petitioner’s sister, so the jury would have considered her (and her husband’s) testimony in light of that obvious bias. And Petitioner has not demonstrated that the Bells’ testimony, even if the jury credited it, would have made the other trial witnesses’ accounts less probable. In a declaration dated December 13, 2004, some 15 years after the events in question, Darci stated that Charlton dropped Peti *1270 tioner off at her house on the morning after the crime and that Petitioner’s bib overalls were not covered in blood that morning. That account does not contradict Charlton’s and Carbonell’s testimony that Petitioner was covered in blood at an earlier time. Darci does not claim to have seen Petitioner during the same time frame when the events to which Charlton and Carbonell testified occurred, nor does she state that Petitioner owned only a single pair of overalls.
The majority also focuses on another waived claim that relates to counsel’s investigation of witnesses: the alleged failure, during cross-examination, to probe two alleged inconsistencies in Carbonell’s account of the crime. This claim also lacks merit. The first alleged inconsistency is that Carbonell initially testified that both Petitioner and Charlton were “covered with blood” when they arrived at Carbo-nell’s house but later testified that Petitioner had more blood on him than Charl-ton did. Those statements are consistent and, in any event, Petitioner’s counsel confronted Carbonell with the prior statement at trial.
Second, Petitioner asserts that Carbo-nell testified that Petitioner “told me he killed [the victim]” but that he had earlier stated only that he had “surmised” that Petitioner personally killed the victim from Petitioner’s statement that Charlton was driving at the time. The majority emphasizes that Carbonell inferred Petitioner’s conduct in part from what Charlton said, but Carbonell also referred to Petitioner’s own statements. Carbonell’s statement was, “[Detrich] didn’t say that he killed the girl. But, he said [Charlton] was driving the car. So, I ... surmised that ... he had been the one that cut the girl. ‘Cause [Charlton] told me later on[ ] that he did cut the girl up.” (Emphasis added.) Any inconsistency between that statement and Carbonell’s testimony at trial is negligible because the earlier statement clearly shows that Carbonell inferred Petitioner’s conduct, at least in part, from what Petitioner said. It was objectively reasonable for Petitioner’s counsel to avoid further discussion of this apparent confession during the cross-examination of Carbonell.
Claim 2: Failure to Investigate Charl-ton Adequately
Petitioner’s second claim is that his lawyer failed to investigate co-defendant Charlton — specifically, to uncover his racism. The majority views this claim as potentially “substantial.”
At trial, Petitioner’s counsel vigorously sought to demonstrate that Charlton’s account of the murder was a lie. To that end, the lawyer noted (among other factors) Charlton’s motive to assist the government under his favorable plea agreement, inconsistencies in his accounts of the night of the crime, his decision to alter his personal appearance after the incident, and his motives to kill the victim himself. Those theoretical motives included Charl-ton’s obsession with martial arts and violence and, as relevant here, his racism; because the victim was black, Charlton, as a racist white man, had a motive to kill her that Petitioner did not necessarily have.[9] Two witnesses — Deborah Charlton (Charl-ton’s wife) and Phillip Shell (Charlton’s cellmate in jail) — testified to Charlton’s racism. Deborah Charlton testified that *1271 her husband “didn’t like [black people] at all,” that “[h]e called them mud ducks,” that “he made his opinion known real well,” and that he was violent, obsessed with knives, and “partial to” martial arts. Shell, whose testimony from Petitioner’s first trial was read to the jury, testified that Charlton called Petitioner a “Nigger lover,” referred to the victim as “‘[t]hat black bitch,’ things like that,” and that he told Shell that he, not Petitioner, killed the victim because he became angry when he saw Petitioner kissing a black woman.
Given that counsel introduced ample evidence of Charlton’s racism and that it was only one piece of a much larger strategy to impeach Charlton’s testimony, neither deficient performance nor prejudice can be attributed to counsel’s failure to produce more such evidence.
Claim 3: Failure to Interview Shell
Petitioner’s next claim is that his lawyer was ineffective for “failing] to interview, call as a witness, or introduce the prior testimony of Phillip Shell.”[10] As I have explained, the claim that counsel should have called Shell as a live witness was explicitly considered on the merits by the state court after Petitioner raised it during the initial-review collateral proceeding. Martinez is therefore inapposite.[11]
Even if it were subject to Martinez, Petitioner’s claim that counsel was ineffective in failing to call Shell as a live witness is factually misleading and lacks merit. Shell was detained as a material witness, and he testified in the first trial in which Petitioner was convicted. The record shows that defense counsel for Petitioner’s later trial (the allegedly ineffective lawyer) hired an investigator to locate Shell, who was out of state, spoke with him repeatedly, and attempted to call him as a witness. When doing so proved impracticable, defense counsel instead introduced Shell’s prior sworn testimony, which was read to the jury. That decision did not constitute deficient performance.
Claims 4, 5, and 6: Alleged Errors During Voir Dire
Petitioner raises three claims related to his lawyer’s performance during voir dire. He alleges that his lawyer was ineffective for failing to “conduct adequate voir dire,” “request recording of the peremptory strike process,” and “rehabilitate jurors regarding issues about the death penalty.”
As I have explained, the state courts have decided Petitioner’s “failure to rehabilitate” claim on the merits, and it therefore is not subject to Martinez. The remaining two of these claims are largely contradicted by the record. Defense counsel participated actively in voir dire, particularly in relation to jurors’ potential biases regarding the death sentence. He submitted a jury questionnaire that included questions on racial bias and jurors’ views on the death penalty, objected to “death qualification” questions, acknowledged the “rehabilitation” of a prospective juror, raised questions for the court to ask particular jurors, and moved to excuse several prospective jurors for cause. Moreover, a record showing each lawyer’s use of peremptory strikes was kept. Without any explanation as to how or why trial counsel should have requested additional records, *1272 Petitioner’s “recording” claim fails to show deficient performance or prejudice.[12]
Claim 7: Failure to Conduct Forensic Testing
Petitioner’s seventh claim is that his lawyer should have conducted independent forensic testing on evidence collected from the scenes of the crime (the victim’s home and Charlton’s car).
The majority assumes that Petitioner’s claim here is distinct from the forensic testing claim that, as noted above, the state court decided on the merits. Here, Petitioner asserts that his counsel was ineffective for failing to obtain independent forensic testing of evidence that includes hairs, a knife, and a needle. The district court treated that claim as procedurally defaulted because it viewed Petitioner’s claim before the state court as limited to forensic testing of blood and blood pattern evidence. But, before the state court, Petitioner argued that his counsel was deficient for failing to “obtain all reports and review all physical evidence.” (Emphases added.) He argued that available blood pattern evidence contradicted Charlton’s testimony and that, for that reason, counsel should have investigated “the physical evidence ” more. (Emphasis added.) He acknowledged that he could not, at the PCR stage and without further funding, identify specifically what other forensic evidence would have benefitted his case, but his claim as to what counsel should have investigated extended to all forensic evidence. The state court’s denial of Petitioner’s claim for failure to investigate “the forensic evidence at trial” was not limited to one type of evidence, and its ruling on the merits renders Martinez inapplicable here.
Assuming, though, that Petitioner’s claims are “new” for these purposes, they nevertheless lack merit because Petitioner cannot show prejudice. The state did conduct forensic tests of hairs and fingernails (as well as examinations for fingerprints, blood, and semen in the car). To the extent that those tests reached conclusive results, they provided evidence that corroborated the percipient witnesses’ testimony against Petitioner.[13] Billing records show that Petitioner’s counsel interviewed the state’s forensic pathologist, Dr. Thomas Henry, and forensic examiner, Dr. Deborah Friedman; the decision not to hire an independent investigator resulted neither from ignorance nor from a failure to inquire into its necessity. Petitioner’s counsel effectively cross-examined Dr. Henry at trial. Furthermore, the state’s forensic *1273 evidence did not stand alone. It complemented extensive testimonial evidence: that Petitioner entered the car on the passenger side while Charlton drove, that he killed the victim himself, that he was covered in blood after the crime, and that he confessed to the murder shortly afterward. Petitioner therefore cannot make a substantial showing of either deficient performance or prejudice with respect to that forensic evidence.
Neither does Petitioner show deficiency or prejudice with respect to the alleged murder weapon and the needle found at the victim’s home. At trial, Petitioner’s counsel developed a theory that the evidence could not prove that a particular knife (there were several available to Petitioner) was the murder weapon. Again, the lawyer made a reasonable judgment that the opinion of the state’s pathologist was sufficient to support that theory. The jury either found that it could identify the knife or concluded that identifying which of the available knives Petitioner actually used was not important. As to the needle, Petitioner argued before the state courts that forensic analysis of the needle used for shooting cocaine “would have revealed inconsistencies in the testimonies.” But he does not explain what those inconsis-tences would have been or how counsel’s failure to reveal them caused prejudice to Petitioner.
Claim 8: Error Relating to Misidenti-fication Defense
Petitioner’s eighth claim is that his trial lawyer undermined his own misidentification defense by introducing contrary evidence. This allegation is so vague — Petitioner does not specify what evidence was allegedly introduced in error — that it cannot present a substantial Strickland claim.
Claim 9: Failure to Object to Prose-cutorial Vouching
Petitioner’s ninth claim is that his lawyer failed to object to prosecutorial vouching in support of Charlton’s testimony. In his second petition for post-conviction review, Petitioner asserted that the state vouched for Charlton by reviewing his testimony during closing argument. That type of reference during argument is not vouching. See United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir.1993) (holding that vouching consists of “assurances of the witness’s veracity, or suggesting that information not presented to the jury supports the witness’s testimony”). The decision of Petitioner’s counsel not to challenge the statements at issue therefore was not objectively unreasonable.
Claim 10: Cumulative Error
Petitioner’s final claim is that the foregoing errors, cumulatively, amounted to ineffectiveness. Most of Petitioner’s claims rely on misleading characterizations of the factual record that, even if true, would not establish significant prejudice. Taken cumulatively, they still are not substantial.
4. Conclusion
In conclusion, some of Petitioner’s Martinez claims are not properly before us because Petitioner did not separately identify them in his motion, and some are not properly Martinez claims because they were not procedurally defaulted. None of the claims at issue presents a potentially successful Strickland claim. For that reason, the claims are not “substantial,” and Martinez does not excuse their default. In Martinez, the Supreme Court described its new rule as a “narrow exception” to the principle, set forth in Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), that a lawyer’s ignorance or inadvertence in a post-conviction proceeding does not qualify as “cause” to excuse a procedural default. Martinez, *1274 132 S.Ct. at 1315. That narrow exception is not intended to permit relitigation of guilt-phase proceedings on unsupported or legally frivolous grounds. Because Petitioner’s newly raised claims either are not properly raised or lack merit, or both, I would deny the remand motion.
B. Claim of Ineffective Assistance of Counsel at Sentencing
I also disagree with the majority’s decision not to decide the sentencing issue now. That issue was decided below and has been briefed and argued on appeal, twice — once to the three-judge panel and next to the en banc court. Nothing remains for us to do but decide it. To be sure, notwithstanding my view of their lack of merit, the district court could in theory grant relief on Petitioner’s guilt-phase IAC claims on remand. But if it does not, Petitioner’s appeal on the sentencing issue will return to us and require a decision. It will be the same issue, with the same relevant facts, when it returns, so we should decide it while we are familiar with it and avoid the redundant proceedings that will likely be required later. Even if the district court were to grant relief on Petitioner’s guilt-phase claims, we will have lost nothing but a few pages of text in making a decision. For the following reasons, I would affirm the district court’s denial of habeas relief on this claim.
1. Facts Relevant to Sentencing Claim
At sentencing, the prosecution sought the death penalty. It argued that the evidence produced at trial showed that the crime was “especially cruel, heinous, or depraved,” an aggravating circumstance under then section 13-703(F)(6) of the Arizona Revised Statutes. Petitioner submitted a sentencing memorandum proposing five mitigating circumstances relating to Petitioner’s personal background, his criminal history, his remorse, his capacity to appreciate the wrongfulness of his conduct at the time of the crime, and the relative sentence received by Charlton. He also submitted a letter from his sister that described his background of childhood abuse and problems with drugs and alcohol.
The trial court held a two-day aggravation/mitigation hearing. Petitioner’s lawyer argued (1) that Petitioner was not death-eligible under Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), because he did not personally commit the murder; (2) that the crime was not especially cruel, heinous, or depraved; and (3) that the mitigating circumstances warranted leniency.
The evidence before the court at the hearing included a 1985 report by psychologist Dr. Larry Zimmerman, a 1985 clinical evaluation approved by psychiatrist Dr. George Penn, and a 1991 report by psychologist Dr. Catherine Boyer. Together, these studies revealed a long history of childhood abuse, alcoholism, and physical and emotional trauma. They noted that Petitioner suffered from emotional problems related to abuse at the hands of his stepmother and discussed his anger toward parental figures. The 1985 reports noted that Petitioner engaged in “severe” drug and alcohol abuse in his past, and the 1991 report explained its effect on his behavior, observing that “if [Petitioner] is drinking and someone makes him angry, he begins to escalate in his anger [and he] feels that he has approached a trigger point.” The later report recognized a connection between Petitioner’s alcoholism and his potential for violence, citing an incident in which Petitioner, while drunk, threatened to kill his wife.
The sentencing court also reviewed several letters from Petitioner’s sister, in *1275 which she described Petitioner’s childhood and lifelong alcohol abuse. The letters explained that Petitioner’s stepmother abused him physically and verbally, that his stepfather encouraged Petitioner to engage in bouts of heavy drinking beginning by age thirteen or younger, and that Petitioner struggled with alcoholism throughout his life.
After reviewing those documents, and relying on the evidence and testimony at trial, the sentencing court found that Petitioner personally committed the murder. As aggravating factors, the court found that the murder was especially cruel because the victim was conscious throughout much of the crime, endured extreme physical pain, and suffered extreme mental distress. The court ruled that the murder was heinous and depraved because Petitioner relished the murder and inflicted gratuitous violence well beyond that needed to cause death and because the victim was helpless, and the crime was senseless. The court found that there were five mitigating circumstances: Petitioner’s capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired by alcohol and drugs at the time of the crime; Petitioner comes from a background of physical and mental abuse; Petitioner felt some remorse for the murder; Petitioner did not have prior convictions for crimes of violence; and Petitioner had a longstanding history of alcohol and drug abuse. After weighing these mitigating factors against the aggravating circumstance, the court imposed a sentence of death for the murder and twenty-one years in prison for the kidnapping.
Petitioner sought post-conviction relief in state court, alleging (as relevant here) ineffective assistance of counsel at sentencing. Petitioner’s claims of ineffectiveness at sentencing included an allegation that his lawyer did not adequately investigate and present mitigation evidence. Petitioner hired a neuropsychological expert, Dr. Robert Briggs, who produced a report on Petitioner’s background and mental health. Petitioner’s family members supplied statements concerning details of Petitioner’s background, which included severe childhood abuse (being chained up, pushed down stairs, held under water in the bathtub, and encouraged to drink alcohol and use drugs as a pre-teen) and life-long problems with alcohol and drugs. The state post-conviction court held that Petitioner failed to establish ineffective assistance under Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because he showed neither deficient performance nor prejudice. The court reasoned that “Dr. Briggs’ report was not significantly different from the [1991] report considered” at the sentencing hearing and that “additional evidence of Petitioner’s dysfunctional childhood would have been merely cumulative and was not ‘newly discovered.’ ” For that reason, the court concluded that there was no “reasonable probability” that, had Petitioner’s counsel uncovered and presented additional evidence regarding Petitioner’s background, doing so would have resulted in a different sentence. The Arizona Supreme Court denied review.
2. Standard of Review
We review de novo a district court’s denial of habeas corpus relief. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.2004). We review a district court’s factual findings for clear error. Brown v. Ornoski, 503 F.3d 1006, 1010 (9th Cir.2007).
Our review of the underlying state court decisions is governed by AEDPA. Brown, 503 F.3d at 1010. Under AEDPA, we must defer to a state court’s decision with respect to any claim that was adjudicated *1276 on the merits unless the adjudication of the claim:
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d). Our review “is limited to the record that was before the state court that adjudicated the claim on the merits.” Pinholster, 131 S.Ct. at 1398, 1400 n. 7.
Where, as here, the factual determinations of the state court are not in dispute, the state court’s decisions as to whether those facts amount to deficient performance or prejudice under the Strickland standard are applications of federal law that we review under § 2254(d)(1). See Pinholster, 131 S.Ct. at 1411 (applying § 2254(d)(1)’s “unreasonable application of [Supreme Court] precedent” standard to a state court’s determinations on both deficiency and prejudice). Under § 2254(d)(1), a state court’s decision involves an “unreasonable application” of clearly established federal law if it “identifies the correct governing legal principle from [the Supreme Court’s] decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736, 159 L.Ed.2d 683 (2004) (per curiam) (internal quotation marks omitted).
Our review of a state court’s denial of a claim of ineffective assistance of counsel is “doubly deferential,” in that the petitioner must show that it was unreasonable for the state court to conclude both that he had not overcome the strong presumption of competence and that he had failed to undermine confidence in the outcome of the state court proceeding. Pinholster, 131 S.Ct. at 1403 (internal quotation marks omitted). We apply this deferential standard to review the state court’s last reasoned decision. Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).
3. Discussion
I would not reach the deficient-performance prong of the Strickland, analysis because Petitioner cannot establish that his sentencing counsel’s alleged error resulted in prejudice. In assessing prejudice with respect to a capital sentence, our inquiry is “whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Strickland, 466 U.S. at 695, 104 S.Ct. 2052. We “reweigh the evidence in aggravation against the totality of available mitigating evidence.” Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
The Arizona Supreme Court found one aggravating circumstance: that the crime was “especially heinous, cruel, or depraved” within the meaning of section 13-703(F)(6) of the Arizona Revised Statutes.[14] Detrich II, 932 P.2d at 1338-39. *1277 The court concluded that the murder was especially “cruel” because the victim consciously suffered both mentally and physically before she was killed. It found that she suffered mentally when Petitioner held a knife to her neck, threatened to kill her, and dragged her to Charlton’s car. Id. at 1339. It noted that, physically, the victim suffered a slit throat and forty knife injuries to her face, hands, chest, neck, abdomen, and thigh. Id. at 1338-39. She also suffered blunt force trauma injuries, including bruises on her nose, jaw, and scalp, and scraping and tearing of the lining of her mouth. Id. Evidence suggesting that she was conscious during some of the attack included testimony that she “looked terrified” as Petitioner forced her into the car, that the wounds on her hands were consistent with “defensive-type injuries one would sustain while trying to fend off an attacker,” and that she responded to questions with a gurgling noise after her throat was slit. Id. at 1338-39. The state court further found that the crime was especially “heinous” and “depraved” because of the gratuitous violence beyond that necessary to cause death; because Petitioner relished in the murder, asking Charlton if he “want[ed] a shot” at the dead body; because the killing was senseless; and because the victim was helpless. Id. at 1339.
The state court’s conclusion, from that evidence, that the crime was especially cruel, heinous, and depraved, id. at 1339, is entitled to significant weight. Nothing before the state post-conviction court alters the significance of these facts or the state court’s conclusion that they constituted an aggravating circumstance under section 13-703(F)(6).
As for mitigation, the sentencing court found that most of the mitigating circumstances that Petitioner asserted were present.[15] As a statutory mitigating factor, the court found that Petitioner’s intoxication at the time of the crime impaired his capacity to appreciate the wrongfulness of his conduct or conform it to the law. As non-statutory mitigating factors, the sentencing' court found that Petitioner felt some remorse for the murder, lacked a history of violent crime, and came from a background of mental and physical abuse. The Arizona Supreme Court gave full consideration to these mitigating factors and concluded that, “when balanced against the circumstances constituting the sole aggravating factor, the mitigating evidence is insufficient to warrant leniency.” Detrich II, 932 P.2d at 1340.
The mitigation evidence on which the. state court rested that conclusion included substantial evidence of Petitioner’s problems with drugs and alcohol and his background of mental and physical abuse. Specifically, Petitioner’s sister had submitted several letters in which she described the physical and mental abuse that Petitioner experienced at the hands of his stepmother, as well as his history of heavy drinking beginning by age thirteen or younger. The sentencing court also considered three expert reports that discussed *1278 the foregoing background and Petitioner’s psychological state as an adult. Although both of the 1985 reports note that Petitioner suffered from certain emotional characteristics — such as impulsivity, immaturity, poor judgment, and low tolerance for frustration — both reports stated that Petitioner did not suffer from a thought disorder or from delusional thinking. The 1991 report confirms these conclusions, noting that Petitioner did not exhibit any symptoms of a major mental disorder or any other significant psychiatric disturbance and that his thought processes were logical and coherent.
In post-conviction review, Petitioner argued that additional mitigation evidence regarding his traumatic childhood and its effects on his mental health might have resulted in a different sentence. But the additional evidence regarding Petitioner’s mental health that he offered during post-conviction review — the Briggs report — is not significantly different from the reports that were already before the sentencing court. Like the other examiners, Dr. Briggs reviewed Petitioner’s history of childhood abuse and dependence on alcohol and drugs and noted that Petitioner experienced impulsivity and other emotional problems. Also like the previous evaluators, Dr. Briggs uncovered no pattern of cognitive dysfunction and determined that Petitioner’s neurological functioning was within the normal range. Dr. Briggs acknowledged that Petitioner appeared to suffer some overall impairment of function, likely due to “an interaction between his emotional state and his mild neuropsycho-logical deficits.” In the end, though, the Briggs report’s characterization of Petitioner’s childhood, substance abuse problems, and mental state is similar to the psychological and psychiatric reports that the sentencing court considered.
Petitioner also presented additional letters from his family detailing his abusive childhood and history of substance abuse but, like the Briggs report, the letters essentially duplicate material that the sentencing court had. Both the letters from Petitioner’s family and the mental health evaluations that were available to the sentencing court detailed the same types of abuse and neglect that appear in the new letters. Because that evidence is cumulative with what the sentencing court considered, it does not establish a reasonable probability that a better investigation and presentation of Petitioner’s background would have resulted in a different sentence. See Miles, 713 F.3d at 494-95 (finding that the addition, during post-conviction proceedings, of cumulative mitigating evidence relating to social history was insufficient to demonstrate ineffectiveness).
4. Conclusion
In sum, the state posLconviction court reasonably held that there was no reasonable probability that, even if Petitioner’s counsel had more fully investigated and presented the available mitigation evidence, Petitioner would have received a different sentence. Because the Arizona Supreme Court reasonably held that Petitioner suffered no prejudice within the meaning of Strickland, Petitioner’s claim for habeas relief should be denied.

. To the extent that Petitioner now seeks to contradict the state court's factual determinations, he bears a heavy burden of proof. See 28 U.S.C. § 2254(e)(1) (providing that the state court's factual determinations "shall be presumed to be correct” unless the petitioner rebuts that presumption “by clear and convincing evidence”). Indeed, he does not contend on appeal that the quoted findings are erroneous; as noted, he raises only a sentencing claim about mitigation.

. This exception applies only if, "under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding,” Martinez, 132 S.Ct. at 1320, or if the state’s procedural system “does not offer most defendants a meaningful opportunity” to present such claims on direct appeal, Trevino, 133 S.Ct. at 1921. In Martinez, the Supreme Court made clear that Arizona’s procedural rules fall within the first of those categories.

. The Martinez framework results in a potential overlap of analysis because the merits of the underlying guilt-phase IAC claim are relevant to both prongs. Thus, if the claim is not “substantial” under the second prong, it is difficult to see how post-conviction counsel’s failure to raise it could be prejudicial under the Strickland analysis required by the first prong. This overlap becomes more prominent where, as here, there is post-conviction counsel but counsel is alleged to be ineffective.
The majority’s answer to this overlap is to hold that a petitioner "need not show actual prejudice resulting from his PCR counsel’s deficient performance, over and above his required showing that the trial-counsel IAC claim be ‘substantial’ under the first Martinez requirement.” Maj. op. at 1245-46. But the Supreme Court has never suggested that the prejudice prong of Strickland has a unique meaning in the context of the second Martinez requirement. The majority relies, oddly, on Justice Breyer’s non-precedential statement respecting the denial of certiorari in Gallow v. Cooper,-U.S.-, 133 S.Ct. 2730, 186 L.Ed.2d 935 (2013). Only two justices joined that statement, so it is not a binding legal *1266 authority. And, on its own terms, the statement is irrelevant. Gallow concerned egregious ineffectiveness by trial counsel; Justice Breyer merely observed that a failure to present admissible evidence on such a claim arguably establishes cause because it might have resulted in the procedural default of that claim — that is, in prejudice. And Justice Breyer asserted only that the Fifth Circuit might have erred by refusing to consider evidence on that Martinez claim on account of Cullen v. Pinholster,-U.S.-, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). That issue is distinct from any presented here.

. We have done the same thing in an array of other contexts. See, e.g., Hedlund v. Educ. Res. Inst. Inc., 718 F.3d 848, 853-54 (9th Cir.2013) ("Because this court is in as good a position as the district court [to do so], it independently reviews the bankruptcy court’s decision.” (internal quotation marks omitted)); United States v. Song la Cha, 597 F.3d 995, 1006-07 (9th Cir.2010) (denying the government’s request for a remand to allow the district court to apply new Supreme Court precedent to purely "legal determinations” regarding whether a police seizure warranted evidentiary suppression); Blanchard v. Morton Sch. Dist., 509 F.3d 934, 938 (9th Cir. 2007) (affirming a judgment that had been incorrect at the time decided, because an intervening Supreme Court decision provided an alternate ground to affirm).

. The motion also states, in a footnote, that it “incorporates by reference” all additional trial-counsel IAC claims that are contained in its amended habeas petition and traverse before the district court. There are dozens of such claims. This bare, passing reference is inadequate to bring an issue properly before us. See United States v. Kama, 394 F.3d 1236, 1238 (9th Cir.2005) ("Generally, an issue is waived when the appellant does not specifically and distinctly argue the issue in his or her opening brief.”).

. The claim regarding the Bells does appear in Petitioner’s reply brief, but issues raised for the first time in a reply brief are also waived. United States v. Anekwu, 695 F.3d 967, 985 (9th Cir.20I2), cert. denied,-U.S.-, 133 S.Ct. 2379, 185 L.Ed.2d 1094 (2013). The claim related to Carbonell appears nowhere in Petitioner’s briefs in support of the remand motion — it appears only in Petitioner's amended habeas petition.

. The majority asserts that the jury’s split verdict is strong evidence that "only nine jurors were convinced that Detrich, rather than Charlton, was the actual killer.” Maj. op. at 1241. That assertion is speculative. The three jurors who voted for felony murder, rather than premeditated murder, did not necessarily find that Charlton was the killer. Their votes could reflect a conclusion that Petitioner killed the victim in the course of kidnapping her, but that the prosecution failed to prove premeditation. The prosecutor in fact told the jury, in closing, that it could convict Petitioner of felony murder on this alternative theoiy. Thus, the three jurors’ votes are ambiguous. In the face of this ambiguity, the split verdict is not evidence, strong or otherwise, about which alternative persuaded the three jurors.

. Moreover, under Arizona law, the children of a murder victim may refuse to be interviewed or deposed by the defendant, Ariz. Const, art. II, § 2. 1(A)(5); Ariz.Rev.Stat. § 13-4401(19), so counsel’s decision not to interview the victim’s daughters is unsurprising and certainly not deficient.

. Interestingly, in the first PCR proceeding, Petitioner’s PCR counsel acknowledged that trial counsel had pursued several avenues designed to show that Charlton was lying, including evidence that Charlton and Petitioner were together the entire evening of the murder, that the knife Charlton identified as the murder weapon could not have killed the victim, that Charlton had previously lived near the site where the victim’s body was found, and that Charlton hated blacks, while Petitioner did not.

. The allegation, as one part of this claim, that Petitioner’s trial counsel failed to introduce Shell’s prior testimony at all is plainly contradicted by the trial record: Shell's prior testimony was read to the jury at trial.

. Although the state court transcript referred to the witness as "William Schell," the record leaves no doubt that the ruling on the merits concerned Phillip Shell and that this reference was just a mistake. The mistake may have come about because a Mr. Williams read Shell’s testimony at the final trial.

. More generally, Petitioner alleges no substantive error during voir dire or any jury bias that may have prejudiced his trial. For example, he does not assert that a Batson challenge should have been raised, and the failure to object during voir dire does not establish a Strickland claim without a showing of prejudice. See Carrera v. Ayers, 699 F.3d 1104, 1107 (9th Cir.2012) (en banc) (rejecting a claim of ineffective counsel arising from a lawyer's decision not to object during voir dire, where the petitioner made no showing that the underlying Wheeler claim had some merit), cert. denied,-U.S.-, 133 S.Ct. 2039, 185 L.Ed.2d 899 (2013). At most, he merely alleges, implicitly, that counsel should have worked harder and obtained a more sympathetic jury. That is not a substantial Strickland claim. See Hovey v. Ayers, 458 F.3d 892, 910 (9th Cir.2006) (rejecting claim of deficient performance premised on counsel's general failure to participate actively in voir dire).

. The majority makes the far-fetched assertion that the absence of semen in the car "reinforces" Shell’s testimony that Petitioner kissed the victim and that Charlton killed her. That is not a logical inference. Evidence of semen was in no way necessary to the prosecution's theory of the case. Nor is the absence of semen affirmative evidence of kissing or of any other relevant fact. This category of forensic evidence is therefore equally consistent with both accounts of the crime.

. Under applicable Arizona case law, the (F)(6) statutory factor is assessed by examining "the entire murder transaction and not simply the final act that killed the victim.” State v. Lavers, 168 Ariz. 376, 814 P.2d 333, 350 (1991). A murder is "cruel” for these purposes if the victim consciously suffered physical pain or mental distress. State v. Jimenez, 165 Ariz. 444, 799 P.2d 785, 795 (1990). It is "heinous” or "depraved” if the defendant’s words and acts show a state of mind that was "hatefully or shockingly evil” or "marked by debasement, corruption, perversion or deterioration," respectively. State v. Fulminante, 161 Ariz. 237, 778 P.2d 602, 621 (1989) (internal quotation marks omit *1277 ted). Factors relevant to the latter inquiry include “(1) whether defendant relished the murder; (2) whether defendant inflicted gratuitous violence beyond that necessary to kill; (3) whether the defendant mutilated the victim's body; (4) whether the crime was senseless; and (5) whether the victim was helpless.” State v. Lopez, 175 Ariz. 407, 857 P.2d 1261, 1266 (1993).

. Although the court did not consider Petitioner’s co-defendant's sentence of ten years, the disparity of sentences could not be a mitigating factor under Arizona law because the co-defendant’s sentence resulted from a plea agreement. Detrich II, 932 P.2d at 1339-40 (citing State v. Stokley, 182 Ariz. 505, 898 P.2d 454, 472 (1995)).